UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

PAUL BETANCES, et al.,

                      Plaintiffs,

        - against -

BRIAN FISCHER, in his capacity as
Commissioner of the New York State
Department of Correctional Services (DOCS),
and in his individual capacity, et al.,

                    Defendants.

-----------------------------------------------------------------X

11-CV-3200 (RWL)

**DECISION AND ORDER:**
**CLASS DECERTIFICATION**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

       Paul Betances, Lloyd A. Barnes, and Gabriel Velez – individually and on behalf of others similarly situated – bring this class action against Brian Fischer, Anthony J. Annucci, and Terence Tracy (collectively, "Defendants") for violations of their civil rights. The District Court previously certified the class and found Defendants personally liable; the Second Circuit affirmed and remanded the case to determine the appropriate remedies. The parties consented to jurisdiction before this Court for the remainder of proceedings. In advance of trial, Defendants have moved to decertify the class, contesting the propriety of determining loss-of-liberty damages on a class-wide basis. For the following reasons, the Court denies Defendants' motion and finds that the class should be maintained for the purposes of trial to determine damages for loss of liberty.

**BACKGROUND**[1]

The facts and history of this case have been summarized as set forth in several prior opinions.  *See Bentley v. Dennsion*, 852 F. Supp. 2d 379 (S.D.N.Y. 2012) (denying Defendants' motion to dismiss based on qualified immunity in both this class action and a related action with individual plaintiffs), *aff'd sub nom*, *Betances v. Fisher*, 519 Fed. App'x 39 (2d Cir. 2013) ("*Betances I*"); *Betances v. Fischer*, 144 F. Supp. 3d 441 (S.D.N.Y. 2015) ("*Betances II*") (summary judgment finding Defendants personally liable for violating Plaintiffs' constitutional rights); *Betances v. Fisher*, 837 F.3d 162, 175 (2d Cir. 2016) ("*Betances III*") (affirming *Betances II* and remanding for appropriate remedies); *Betances v. Fischer*, 403 F. Supp. 3d 212 (S.D.N.Y. 2019) ("*Betances IV*") (granting Defendants' summary judgment limiting certain class members to nominal damages but denying the motion in all other respects).  The Court assumes the parties' familiarity with this case's history and therefore only briefly summarizes the facts and procedural posture.

Plaintiffs were convicted of violent felonies in New York State courts, sentenced to varying periods of incarceration, and subjected to unlawful administrative imposition of post-release supervision ("PRS") following incarceration.  Although state law required imposition of PRS following incarceration, the sentencing courts for these individuals

---

[1] The facts are drawn from previous decisions in this case, Defendants' statements pursuant to Local Civil Rule 56.1, Plaintiffs' responses to Defendants' 56.1 statements, the evidence submitted by the parties, and the record.  The facts are undisputed unless otherwise indicated.

failed to include any term of PRS when sentencing them.  During Plaintiffs' incarceration, the administrators responsible for incarceration and parole imposed PRS terms.

On June 9, 2006, the Second Circuit held that administrative imposition of PRS by the New York Department of Correctional Services ("DOCS") was unconstitutional. *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) ("*Earley*"), *reh'g denied*, 462 F.3d 147 (2d Cir. 2006), *cert. denied*, 551 U.S. 1159, 127 S. Ct 3014 (2007).  Defendants are the three individuals remaining in the case who administratively imposed PRS, despite their awareness that such conduct was unconstitutional.  Anthony Annucci was counsel for DOCS from September 1989 until October 2007, when he became deputy commissioner and counsel (a position he held until December 2008).  Brian Fischer served as the commissioner of DOCS from January 2007 to April 2011.  Terence Tracy was chief counsel for the New York Division of Parole ("Parole") from December 1996 until March 2011.

In 2008, two New York Court of Appeals decisions held that administrative imposition of PRS violates New York law.  S*ee Matter Of Garner v. New York State Department Of Correctional Services*, 10 N.Y.3d 358, 362-63, 859 N.Y.S.2d 590, 592-93 (2008) (prohibiting DOCS from imposing PRS); *People v. Sparber*, 10 N.Y.3d 457, 469-70, 859 N.Y.S.2d 582, 587 (2008) (finding that the administrative addition of PRS was not a valid statutory interpretation of New York law).  Following those decisions, DOCS and Parole (along with other state agencies) launched "Post-Release Supervision Resentencing Initiatives." (Def. 56.1 ¶ 12.[2])  In June 2008, the New York State Legislature

---

[2] "Def. 56.1" refers to Defendants' August 10, 2018 Statement Of Undisputed Material Facts Pursuant to Rule 56.1 (Dkt. 200).

amended New York criminal law, codifying the procedures initiated by DOCS and Parole. (Def. 56.1 ¶ 13); *see also* N.Y. Correction Law § 601-d; N.Y. Penal Law § 70.85.

The new legislation created a scheme where DOCS and Parole referred defendants with a possible unlawful PRS to their sentencing courts for potential resentencing. (Def. 56.1 ¶ 14.) By January 2009, almost all relevant individuals had been referred to their sentencing courts; some were resentenced with PRS, some with abbreviated PRS, and some without PRS. (Def. 56.1 ¶ 17; *see* Declaration of Terrence X. Tracy dated May 7, 2015, attached as Ex. F to the Declaration of Michael J. Keane dated August 10, 2018 (Dkt. 203) at ¶ 27).)

## PROCEDURAL HISTORY

On October 20, 2011, Plaintiffs filed their amended class-action complaint alleging that defendants from various state agencies violated their Fourth and Fourteenth Amendment rights by either affirmatively administratively adding PRS to their sentences or failing to prevent the unlawful practice. (Dkt. 5.) Plaintiffs' claims survived Defendants' motion to dismiss based on qualified immunity, and the Second Circuit affirmed Judge Scheindlin's analysis that *Earley* "clearly established that … an administrate imposition of PRS is unconstitutional." *Betances I*, 852 F. Supp. 2d 379, 386, *aff'd*, 519 Fed. App'x at 40-41.

### A.   Class Certification

On October 31, 2014, Plaintiffs filed a motion for class certification (Dkt. 58), which the Court granted on January 28, 2015. *See Betances v. Fischer*, 304 F.R.D. 416 (S.D.N.Y. 2015) ("*Betances Class Opinion.*"). The Court certified the following class:

> [I]ndividuals who were convicted of various crimes in New York State courts on or after September 1, 1998; were sentenced to terms of incarceration but not to terms of PRS;

but were nonetheless subjected to enforcement by defendants of PRS terms after the maximum expiration dates of the determinate sentences after June 9, 2006.[3]

*Id*. at 421.  Judge Scheindlin held that the purported class met the requisite elements of Federal Rule Of Civil Procedure 23 ("Rule 23") governing class actions.  Specifically, the class satisfied the commonality and typicality requirements because "a single common question unites all purported class members: whether defendants' practice of enforcing administratively-imposed PRS terms against all class members was constitutional" and because "[a]lthough the specific circumstances of the class members differ with regard to when PRS was imposed and the various terms of supervision … *all* terms were imposed after *Early*, pursuant to defendants' policy" and therefore the claims of the lead plaintiffs were typical of those of all the class members.  *Id*. at 427-28.  The class also met the requirements for numerosity, ascertainability, and adequacy of representation.  *Id.* at 427-29.

Judge Scheindlin concluded that Rule 23(b) was satisfied because the common question of the Defendants' liability predominated over individual issues.  Defendants argued that the predominating question was "whether their alleged failure to seek, or delay in seeking, resentencing was constitutionally defective" and asserted the answer "turn[ed] on each plaintiff's individualized facts and circumstances."  *Id*. at 429.  Judge Scheindlin rejected that reasoning as an attempt to "revive previously rejected arguments" about the constitutionality of administratively imposed PRS.  *Id*.  Citing *Early* and

---

[3] As framed, the class encompasses both individuals who were reincarcerated for violating administratively imposed PRS as well as individuals who were subject to administratively imposed PRS but were not reincarcerated.  The named Plaintiffs are in the former category, having been subject to both unlawful PRS and reincarceration for violation of PRS.  *See Betances Class Opinion*, 304 F.R.D. at 422-23.

*Betances I*, Judge Scheindlin explained that the Second Circuit already determined that imposing terms of PRS where it was not part of a judicially-imposed sentence was unconstitutional, that *Early* established plaintiffs' constitutional rights, and that Defendants were not entitled to qualified immunity.   Therefore, at that point in the litigation, the predominating common question was "whether the individual defendants should be held liable for [those] violations."   *Id.*   The answer did not depend on any individual determinations because the Plaintiffs alleged they were harmed by a single, uniform policy; therefore, the class could be maintained under Rule 23(b)(3).

With respect to damages, Judge Scheindlin held that the case involved "both general damages, which may be calculated on a class-wide basis, as well as special damages, which require individual determinations."   *Id.* at 431.   Defendants argued that class certification was improper "because each class member was subject to different conditions of PRS, and each class member has different individual circumstances," as a result of which "all damage calculations would necessarily be highly individual."   *Id.* at 430.   Judge Scheindlin agreed that some damages will be individualized but found that common questions would still predominate because Plaintiffs' damages are tied to a single, uniform policy.   *Id.* at 431 ("Though the specific injuries suffered differ among the members of the class, all injuries were caused by the same policy. Therefore, whatever methodology plaintiffs use, the damages will be 'the result of the wrong.'")

Citing Second Circuit precedent, Judge Scheindlin emphasized that general damages for lost liberty would not depend on the individual characteristics or experiences of the class members and "need not be specifically proved".   *Id.* (citing *Kerman v. City Of New York*, 374 F.3d 93, 125 (2d Cir. 2004)).   Judge Scheindlin noted that this logic has

been extended to the loss of dignity suffered by a class of plaintiffs subjected to alleged unlawful strip searches, and in that case the court held that class members were entitled to, at least, general damages.  *Id.*  (citing *In re Nassau County Strip Search Cases*, No. 99-CV-3126, 2008 WL 850268, at *3-7 (E.D.N.Y March 27, 2008) ("*Nassau County*"). Judge Scheindlin likened the instant case to *Nassau County* and explained that although Plaintiffs' injuries are not uniform, "there are several distinct categories, all of which involve a loss of liberty" and "[f]or those plaintiffs who were incarcerated based solely on a violation of administratively-imposed PRS, a jury may find that general damages for the loss of liberty inherent in false imprisonment are warranted, and may be calculated on a class-wide basis."  *Id.*

Noting that Defendants can identify the restrictions placed on each class member, Judge Scheindlin stated that presumed damages could be calculated on a class-wide basis for other, less severe liberty restrictions such as curfew and travel restrictions.  *Id.* Judge Scheindlin hypothesized that "[t]he jury can determine the damages appropriate for each deprivation, based on the type of deprivation.  For example, the jury could determine a particular amount of damages for each day of incarceration. This amount could then be multiplied by the number of days each class member was incarcerated." *Id*. at 432  (citing *Barnes v. District Of Columbia*, 278 F.R.D. 14, 21 (D.D.C. 2011)).  Judge Scheindlin underscored that her decision certifying the class did not mean that the case did not present any individualized damages issues but rather that "the issue of general damages predominates over any individualized damages."  *Id.* at 432.

## B.    First Summary Judgment

In May 2015, following class certification, the parties cross-moved for summary judgment on the merits.  (Dkts. 90, 100.)  Judge Scheindlin granted Plaintiffs' motion and

found Defendants Annucci, Fischer, and Tracy personally liable for violating Plaintiffs' due process rights. *Betances II*, 144 F. Supp. 3d at 453.. On appeal, the Second Circuit affirmed the decision and remanded to determine the appropriate remedies. *Betances III*, 837 F.3d 162.

## C.    First Run-up To Trial

Prior to the Defendants' appeal and the Second Circuit's ruling in *Betances III*, Judge Scheindlin held a status conference on September 2, 2015. (Sept. 2015 Tr. at 2.[4]) Judge Scheindlin's priority was to set a trial date on damages to focus the parties on settlement. (Sept. 2015 Tr. at 8.) At the conference, the parties discussed the possibility of a bellwether trial involving only a few individual plaintiffs. Judge Scheindlin set December 7, 2015 as a trial date and directed the parties to meet and confer regarding whether it would be a jury trial or bench trial and how many and which plaintiffs would proceed to trial at that time. (Sept. 2015 Tr. at 17-18.) Following the conference, the Defendants filed notice of an interlocutory appeal of Judge Scheindlin's summary judgment decision on qualified immunity grounds. (Dkt. 113.) On October 14, 2015, Judge Scheindlin granted Plaintiffs' motion for an order certifying Defendants' appeal as frivolous and retaining the Court's jurisdiction pending the appeal. (Dkt. 121.)

On October 23, 2015, the parties appeared before Judge Scheindlin for another status conference to discuss what a damages trial would look like. (Oct. 2015 Tr. at 2.[5]) Plaintiffs suggested moving forward initially with a bellwether trial for only two to four

---

[4] "Sept. 2015 Tr." refers to the transcript of the status conference held on September 2, 2015 (Dkt. 117).

[5] "Oct. 2015 Tr." refers to the transcript of the status conference held on October 23, 2015 (Dkt. 126).

plaintiffs on all damage issues and later having a class-wide general damages trial if the bellwether trial did not lead to class-wide resolution.  (Oct. 2015 Tr. at 20-21.)  Defendants asked if it made sense to decertify the class at that juncture.  Judge Scheindlin firmly answered no.  (Oct. 2015 Tr. at 47 ("I've got a class-wide liability verdict and we're going to eventually have class-wide common issues that can be tried").)  The parties discussed what, if any, evidence would be presented to a jury at a class-wide trial, including possible expert testimony.  (Oct. 2015 Tr. at 8-13.)  To accommodate all that needed to be accomplished before the parties were trial ready, Judge Scheindlin adjourned trial to February 8, 2016.  (Oct. 2015 Tr. at 54.)

Trial, however, did not go forward.  On December 16, 2015, the Second Circuit granted Defendants' motion to stay proceedings during the pendency of their interlocutory appeal.  (Dkt. 132.)  Nine months later, the Second Circuit affirmed Judge Scheindlin's judgment and remanded the action for further proceedings.  *Betances III*, 837 F.3d 162.

### D.    Second Summary Judgment

Following remand, the parties engaged in discovery.  The parties requested and received multiple extensions of the deadline to complete discovery.  In May 2018, the parties consented to this Court's jurisdiction for remaining proceedings.  (Dkt. 187.)

On August 10, 2018, Defendants filed a motion for summary judgment and to modify or decertify the class.  (Dkt. 199.)  Defendants sought summary judgment on six issues:  (1) whether the class should be modified based on a recent Supreme Court decision addressing tolling of the statute of limitations for class actions; (2) whether Plaintiffs' injuries entitle them only to nominal damages; (3) whether Defendants should be held liable for damages they did not cause; (4) whether the class should be modified to exclude any plaintiff who was previously referred for resentencing; (5) whether the

class should be decertified in the event Plaintiffs are entitled to more than nominal damages; and (6) whether certain plaintiffs are collaterally estopped from claiming false imprisonment.

On February 21, 2019, this Court granted summary judgment in part on the second issue but denied summary judgment on the remaining issues.  A brief discussion of each holding follows.

### 1.    Statute Of Limitations

The filing of the instant case was preceded by three other class action cases brought by individuals who were subject to administratively imposed PRS after the *Earley* decision.  *See Hardy v. Fischer*, 701 F. Supp. 2d 614 (S.D.N.Y. 2010); *Smith v. Paterson*, No. 08-CV-3313, 2010 WL 4359225 (S.D.N.Y Nov. 3, 2010); *Sinclair v. Goord*, No. 07-CV-1317, 2009 WL 9056089 (N.D.N.Y. March 10, 2009).  When the instant case first reached summary judgment on the merits before Judge Scheindlin in 2015, Defendants argued that certain class member claims were barred by the applicable three-year statute of limitations and asked that the class definition be modified to "exclude such claims." *Betances II*, 144 F. Supp. 3d at 456-57.  Judge Scheindlin denied the motion, finding that, under the *American Pipe* tolling doctrine, "the statute of limitations was tolled during the pendency of the three prior putative class actions filed after *Earley*."[6]  *Id.* at 457.

On moving for summary judgment three years later, Defendants renewed their statute of limitations argument, contending that the Supreme Court's recent decision in

---

[6] In *American Pipe And Construction Co. v. Utah*, the Supreme Court held that the "commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."  414 U.S. 538, 553, 94 S. Ct. 756 (1974).

*China Agritech, Inc. v. Resh*, __ U.S. __, __ 138 S. Ct. 1800, 1804 (2018), required a different outcome.  This Court disagreed and held that "*China Agritech* does not compel any different conclusion than what Judge Scheindlin previously decided.  Plaintiffs' claims were tolled during the Prior Class Actions and all Plaintiffs' claims are timely."  *Betances IV*, 403 F. Supp. 3d at 227.  Accordingly, no modification to the class was warranted on statute of limitations grounds.

### 2.    Nominal Or Compensatory Damages

Defendants argued that Plaintiffs are entitled only to nominal damages because they suffered no actual injury from the constitutional violation at issue.  Plaintiffs disagreed.  In discussing this issue, the Court categorized the plaintiffs into three groups to reflect the respective liberty interests that were violated.[7]

The first group consists of Plaintiffs who were reincarcerated based on a violation of their unlawful PRS ("Incarcerated Plaintiffs").  In this group, the liberty interests at issue include freedom from both unlawful incarceration and unlawful post-release supervision. *Id*. at 230-31.  The second group consists of Plaintiffs who were subject to illegal PRS but who were not subsequently incarcerated for violating that PRS ("PRS Only Plaintiffs").[8] The liberty interest at issue for this group is freedom from unlawful supervision.  *Id*. at

---

[7] For clarity and consistency, the Court continues to use the same groupings to refer to the different categories of Plaintiffs.

[8] Within the PRS Only Plaintiff group, there are at least three subgroups based on procedural differences: (1) Plaintiffs who prevailed on an Article 70 or Article 78 proceeding and had their PRS excised; (2) Plaintiffs who were referred for resentencing but the sentencing judge imposed no or only an abbreviated term of PRS; and (3) Plaintiffs not referred for resentencing (or referred too late) but who were relieved of their PRS following the New York Court of Appeals decision in *People v. Williams*, 14 N.Y.3d 198, 899 N.Y.S.2d 76 (N.Y. 2010).

231.   The third group consists of Plaintiffs who were referred for resentencing and received the same terms of PRS *nunc pro tunc* as they had received under unconstitutionally imposed administrative PRS ("*Nunc Pro Tunc* Plaintiffs").  *Id.* at 231-32.

The Court analyzed the three plaintiff groups and determined what kind of damages were available to each.  The Court held that Incarcerated Plaintiffs and PRS Plaintiffs were not limited to nominal damages, while *Nunc Pro Tunc* Plaintiffs were limited to nominal damages.  *Id.* at 230-34.

### 3.   Causation And Defendants' Liability

In *Betances III*, the Second Circuit affirmed the district court's summary judgment decision finding Defendants personally liable.  Defendants nonetheless argued to this Court that the Second Circuit "left open the question of whether Defendants caused the damages resulting from any injuries to class members."  *Id.* at 234.  Defendants' argument was grounded on a footnote in the Second Circuit's decision.[9]  This Court rejected Defendants' interpretation of the footnote and held that "[t]he Second Circuit left open the door to reducing damages, but it did not leave open the possibility of relitigating whether Defendants can be held liable."  *Id.*  Consistent with the Second Circuit's footnote, this Court left open the opportunity for Defendants to potentially argue at a damages trial that certain individual injuries may be due to the action of others and therefore are not attributable to Defendants.  *Id.* at 235.

---

[9] *See Betances III*, 837 F.3d at 174 n.2 ("We have no occasion on this appeal to consider how, if at all, the actions of others might inform any assessment of causation for specific injuries claimed by plaintiffs against these defendants. Such matters can be pursued as warranted on remand.").

4.      **Class Modification**

Defendants argued that class members referred for resentencing by Defendants prior to the New York Court of Appeals' decisions in *Garner* and *Sparber* should be excluded from the class because Defendants complied with their duty with respect to those plaintiffs following *Earley*.   The Court found that this issue had previously been resolved by Judge Scheindlin, and Defendants had not identified any new evidence or relevant change of law since *Betances II* and *Betances III* that would merit a different conclusion.   This Court ruled that Defendants were impermissibly seeking to relitigate their liability and denied Defendants' attempt to modify the class based on liability grounds.  *Id.* at 236.

5.      **Class Decertification**

To the extent this Court found that Plaintiffs were entitled to more than nominal damages, which it did for all but the *Nunc Pro Tunc* Plaintiffs, Defendants argued that the class should be decertified because "a highly complicated and individualized analysis is required to determine … what damages any class member may be entitled to."  *Id.* Plaintiffs countered that class-wide damages could be determined with respect to damages common among class members, such as damages for loss of liberty, and that individualized damages could be addressed at a later point.  The Court agreed with Plaintiffs.

The Court revisited Judge Scheindlin's analysis of potential determination of damages on a class-wide basis and held that Defendants did not present any new evidence or authority to suggest that general damages could not be calculated or that damages could only be calculated on an individualized basis.  *Id.* at 237-38.  Defendants simply repeated the argument made in their first summary judgment motion, filed in 2015,

which was rejected by Judge Scheindlin, that each Plaintiff's case was too individualized for a class-wide determination of damages. Defendants failed to account for the fact that a class-wide daily damages value could be assessed for each day of incarceration or other restraint on liberty, and Defendants' arguments failed to provide evidence of case law to persuade the Court otherwise. *Id.* at 238. The Court noted that "[a]s part of the pretrial filings in this case, the parties will be required to discuss and propose a plan as to which damages issues will be determined on a class-wide basis, whether and to what extent subclasses should be created to account for different types of injuries, and what elements of damages will be left to individualized assessment. There is currently no basis, however, to decertify the class." *Id.*

### 6.    Collateral Estoppel

Defendants argued that class members who previously brought false imprisonment claims in the New York Court of Claims should be deemed collaterally estopped from bringing the same claim in this case. The Court agreed with Plaintiffs that this argument was previously addressed by Judge Scheindlin in *Betances II*. In that ruling, Judge Scheindlin distinguished previous cases and noted that the issue of violation of due process rights was never addressed and therefore collateral estoppel did not apply. *Id.* at 239 (citing *Betances II*, 144 F. Supp.3d at 458). Addressing Defendants' attempt to resurrect the issue, this Court held that "as with several other issues discussed herein, Defendants have not identified any change of law, new evidence, or clear error to compel a different outcome." *Id.*

### E.    The June 10, 2021 Conference

The case progressed as the parties simultaneously engaged in settlement discussions and prepared for trial. On June 10, 2021, the Court held a hearing to discuss

issues raised in the parties' pretrial briefings and particularly Defendants' request for decertification in light of what they argued were individualized issues that must be adjudicated in separate damages trials rather than on a class-wide basis.  Plaintiffs argued that a class-wide trial on generalized damages was appropriate because liberty is a right, common to all, that has an intrinsic value, which can be isolated from individual experiences.  (June 2021 Tr. at 6-18.[10])  Defendants countered, underscoring the individualized context and characteristics of each Plaintiff's experience and arguing that individualized issues could not be ignored in measuring the harm they suffered.  (June 2021 Tr. at 44-48.)

Following the hearing, the Court issued an order requesting additional briefing on the issue of whether the class should be preserved for a general damages trial related to loss of liberty.  Specifically, the Court asked the parties to brief the following three questions: "(1) To what extent can the Court properly proceed to trial on a class-wide basis with respect to determining damages for loss of liberty? What precedent is there for or against such a class trial?; (2) What should such a trial consist of with respect to types of evidence, witnesses, and/or argument?; (3) What are the appropriate subclasses for such a trial and why?"  (Dkt. 321.)  The issue was fully briefed as of September 28, 2021.  (*See* Dkts. 326, 329, 330.)  On December 8, 2021, the Court directed the parties to provide answers to several factual questions.  (Dkt. 332.)  The parties submitted their joint responses on December 31, 2021 (Dkt. 333), and on January 25, 2022, the Court held oral argument.

---

[10] "June 2021 Tr." refers to the transcript of the hearing, which took place on June 10, 2021.  (Dkt. 324.)

## CLASS ACTION LEGAL STANDARDS

### A.      Rule 23(a)

To obtain class certification, a movant must establish several requirements by a preponderance of the evidence.  *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 117 (2d Cir. 2013).  A class will be certified "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  These four elements are known in brief as numerosity, commonality, typicality, and adequacy of representation.  *Central States Southeast And Southwest Areas Health And Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007).  Additionally, there is an implied requirement of "ascertainability," which, in the Second Circuit, "requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Securities*, 862 F.3d 250, 264 (2d Cir. 2017), *cert. denied*, 140 S. Ct. 338 (2019).

### B.      Rule 23(b)

If the requirements of Rule 23(a) are met, "[t]he district court must also find that the action can be maintained under Rule 23(b)(1), (2), or (3)."  *In re Literary Works In Electronic Databases Copyright Litigation*, 654 F.3d 242, 249 (2d Cir. 2011).  A plaintiff need establish only one basis for certification under Rule 23(b).  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).  The branch of Rule 23(b) under which Plaintiffs moved for, and the Court granted, certification is the third.  *See Betances Class Opinion*, 304 F.R.D. at 429-32.  For a class to be certified under Rule 23(b)(3), the court

must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

## C.    Decertification

Class certification orders under Rule 23 are not immutable.  An "order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  Indeed, "courts are required to reassess their ruling as the case develops."  *Boucher v. Syracuse University*, 164 F.3d 113, 118 (2d Cir.1999) (internal quotation marks omitted); *see also Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) ("the district court has the affirmative duty of monitoring its class decisions in light of the evidentiary development of the case." (internal quotation marks omitted)).  Courts may decertify classes "if it appears that the requirements of Rule 23 are not in fact met."  *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982).  Reconsideration of class certification is appropriate where there is a "significant intervening event" or "compelling reasons" that the Rule 23 requirements are no longer satisfied.  *Doe v. Karadzic*, 192 F.R.D. 133, 137-38(S.D.N.Y. 2000) (internal citations omitted).  Thus, not only is this Court able to reevaluate its earlier determinations regarding class certification, it has an obligation to do so.  In opposing decertification, the plaintiff retains "the burden to demonstrate that [the Rule 23] requirements [a]re satisfied."  *Mazzei*, 829 F.3d at 270 (citing *Rossini v. Ogilvy And Mather, Inc.*, 798 F.2d 590, 596-600 (2d Cir. 1986)).

## DISCUSSION

The central questions before the Court are whether, at this stage of the litigation, common questions of law and fact predominate over individualized issues and whether

class action remains superior to other available methods for fairly and efficiently adjudicating the controversy.  *See* Fed. R. 23(b)(3).  If the Court answers these questions in the affirmative, the Court must also address Defendants' concerns that named Plaintiffs' claims are not typical of the class.  *See* Fed. R. 23(a)(3).  After thoroughly considering the issue, the Court finds that the class meets the requirements under Rule 23 and should be maintained for purposes of a class-wide general damages trial.[11]

In granting class certification, Judge Scheindlin specifically contemplated that the class would be maintained for a trial on general damages.  *See Betances Class Opinion*, 304 F.R.D. at 431 ("Common questions may still predominate even though some damages will be individualized.  This case involves both general damages, which may be calculated on a class-wide basis, as well as special damages, which require individual determinations").  Even at the October 2015 status conference, Judge Scheindlin made clear that a class-wide trial on general loss of liberty damages would be appropriate and that the class should not be decertified.  (*See* Oct. 2015 Tr. at 47 (noting that decertification was not proper because the Court has "a class-wide liability verdict and we're going to eventually have class-wide common issues that can be tried").)

---

[11] Defendants spend much of their briefing rehashing their arguments regarding causation and Plaintiffs' entitlement to compensatory damages.  The Court previously has addressed both issues and finds no basis to revisit them.  *See Betances III*, 837 F.3d at 174; *Betances IV*, 403 F. Supp. 3d at 234 (noting that "[t]he Second Circuit left open the door to reducing damages, but it did not leave open the possibility of relitigating whether Defendants can be held liable").  As the Court did in its summary judgment decision, however, and consistent with the Second Circuit's opinion in *Betances III*, "the Court leaves open the possibility for Defendants to argue at trial that certain specific injuries may be due to the actions of others and therefore not attributable to Defendants." *Betances IV*, 403 F. Supp. 3d at 235.  For example, if a class member were injured by another prisoner while reincarcerated for a violation of improperly imposed PRS, Defendants may argue that they were not the cause of those injuries.

Similarly, in ruling on the Defendants' 2018 summary judgment motion, this Court held that there was no basis to decertify the class and agreed with Plaintiffs that "[a]ny individualized damages can be dealt with after class-wide damages issues are determined." *Betances IV*, 403 F. Supp.3d at 236.   At that time, Defendants failed to "point the Court to any newly discovered evidence or new authority suggesting that general damages could not be calculated, or only calculated on highly complicated and individualized basis." *Id.* at 238.   Likewise, Defendants have not made the Court aware of any change in law or fact that would merit a different outcome today.

## A.   Numerosity, Commonality, Adequacy, And Ascertainability Remain Satisfied

Defendants do not assert, and the Court is unaware of, any reasons why most of the elements of Rule 23(a) are no longer satisfied.   The class remains sufficiently numerous.   As defined, the class encompasses well over 3,000 individuals by both parties' estimates.   (*See* Dkt. 333 at 1.)   There are common questions of fact or law, including the liberty restrictions placed on Plaintiffs (*e.g.*, incarceration, travel limitations, and curfews) and the damages associated with them.   Adequacy of representation is satisfied because the named Plaintiffs have a vested interest in pursuing the claims of the class and do not have interests antagonistic to the interests of other members, and Plaintiffs' attorneys are highly qualified and experienced.   The class remains ascertainable as Defendants' records and databases contain information identifying the individuals who were subjected to administratively imposed PRS. *See Betances Class Opinion*, 304 F.R.D. at 427-29 (finding sufficient numerosity, commonality, adequacy of representation, and ascertainability for purposes of Rule 23(a)).

Defendants do challenge whether the named Plaintiffs meet the typicality requirement of Rule 23(a).  Before addressing that issue, however, the Court first addresses whether common questions of law and fact predominate over questions affecting only individual class members and whether a class action remains the superior method for resolving the parties' dispute.

## B.    Common Questions Of Law And Fact Predominate Over Individualized Issues

The class in this case was certified before liability had been determined.  Now that liability has been found, several common issues of fact and law have been resolved.  The Court must now determine, pursuant to Rule 23(b)(3), whether remaining questions of law or fact common to class members predominate over any questions affecting only individual members.  Plaintiffs argue that loss of liberty is inherent in any form of unlawful detention (unlawful confinement or restrictions related to administratively imposed PRS) and is compensable as general damages on a class-wide basis.  Defendants argue that damages beyond the nominal can properly be determined only in individual trials, and not class-wide.  The Court agrees with Plaintiffs.

### 1.    General Damages Are Available For Loss Of Liberty

To begin, the Second Circuit has determined that loss of liberty is a distinct form of damage for which "general damages" may be recovered.  *Kerman*, 374 F.3d 92.  In *Kerman*, the individual plaintiff, Kerman, brought an action against a New York City police officer who ordered that Kerman be detained and involuntarily hospitalized for psychiatric observation.  A jury found that Kerman's Fourth Amendment rights had been violated but

awarded him only nominal damages.  The trial court denied Kerman's motion for a new trial for damages on his Fourth Amendment claims.

The Second Circuit reversed and held that while Kerman was not entitled to a new trial regarding damages for claims related to physical pain, mental suffering, and medical expenses, he was entitled to a new trial with respect to compensatory damages for his loss of liberty.  *Id.* at 122-23.  The Court explained that compensatory damages awarded for false imprisonment fall into one of two categories: general damages or special damages.  In distinguishing the two, the Court noted that "[g]eneral damage is a harm of a sort inseparable from the unlawful restraint" and "upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to general damages for loss of time and humiliation or mental suffering."  *Id.* at 125 (internal citations and brackets removed).  General damages "need not be specifically proved" and "may be inferred from the circumstances of the arrest or imprisonment."  *Id.* (quoting McCormick, *Handbook on the Law of Damages* § 107, at 375–77 (1935)).  Conversely, special damages "commonly include physical discomfort, shock, or injury to health, loss of employment, and injury to the plaintiff's reputation or credit and must be specifically pleaded and proven."  *Id.* (internal quotation marks omitted).

Plaintiffs argue that *Kerman* "reiterates this core principle – that the loss of time as a free person caused by an unconstitutional deprivation of liberty is itself a compensable injury, separate and apart from any individualized damages …."  (Pl. Supp. Mem. at 3.[12]) *See also* June 2021 Tr. at 7 (Plaintiffs arguing that *Kerman* "unequivocally identifies …

---

[12] "Pl. Supp. Mem." refers to Plaintiffs' Supplemental Pre-Trial Memorandum Of Law (Dkt. 326.)

this specific harm, the denial of liberty, and separates it analytically from one's individual experience, their emotional injuries, and the like."). Defendants have provided no authority to the contrary or to show that *Kerman* does not control. Accordingly, "[a] loss of time, in the sense of loss of freedom, is inherent in any unlawful detention and is compensable as general damages." *Kerman*, 374 F.3d at 130.

> **2.      Loss Of Liberty Damages Can Be Determined On A Class-wide Basis**

That begs the question, however, whether general damages for loss of liberty can be determined on a class-wide basis. Plaintiffs argue that is possible and point to *In re Nassau Country* as an example.

In *Nassau County*, plaintiffs brought a class action alleging that Nassau County Correctional Center's blanket policy of subjecting all newly admitted, misdemeanor detainees to a strip search, without any individualized suspicion, violated their Fourth Amendment rights. 2008 WL 850268. The district court denied plaintiffs' motion for class certification, but the Second Circuit reversed and remanded "with instructions to certify a class as to liability and consider certifying a damages class as well." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006). The district court subsequently certified plaintiffs' general damages class and relied, in part, on *Kerman*.

Specifically, the court highlighted the Second Circuit's discussion of general and special damages and compared Kerman's damages claim for loss of liberty to the class plaintiffs' claim of injury to dignity. *Nassau County*, 2008 WL 850268 at *4-6. The court stated that it was undisputed that "the violation at issue – the strip search – resulted in some injury to the class members" and held that "[a]t the very least, the class members are entitled to general damages." *Id.* at *5-6.

22

The court rejected the defendants' argument that even if general damages should be awarded in a strip search case, they should not be determined on a class-wide basis because doing so was unprecedented.  *Id.* at *6 (citing discrimination cases where class-wide assessment of monetary relief was found to be more appropriate than individual assessment).  The court concluded "[t]here is no reason that a jury in this case, hearing the procedures used by Defendants for strip searches together with the testimony of a number of class members as to the circumstance of actual searches, could not determine an amount of general damages awardable to each member of the class."  *Id.* The court noted that although "care would have to be taken to ensure that the amount awarded for general damages excludes all elements of special damages that individual class member might then pursue," the task was difficult but possible.  *Id.*

Plaintiffs also point to *Dellums v. Powell*, a case from the D.C. Circuit Court of Appeals, as an example of a court allowing generalized damages for false imprisonment and false arrest claims to be determined on a class-wide basis at trial.  566 F.2d 167 (D.C. Cir. 1977).  In *Dellums*, a class of anti-war protestors brought claims against the chief of the United States Capitol Police for violations of the First and Eighth Amendments, false imprisonment, and false arrest.  The jury awarded damages on false arrest and false imprisonment claims based on the number of hours an individual was detained.[13]  *Id.* at 174 n.6.  Specifically, the jury awarded damages on a sliding scale: for 12 hours or less,

---

[13] The jury in *Dellums* also awarded $7,500 to each class member for First Amendment damages.  566 F.2d at 194.  The D.C. Circuit noted that First Amendment violations are "no less administrable than damage awards for other intangible interests protected by the Constitution or at common law" and are "only one example of a non-quantifiable interest whose recompense in money damages is routinely left to a jury under proper instructions." *Id.* at 195. However, the court vacated the judgment because it was disproportional to the harm suffered.  *Id.* at 196.

$120; for 12-24 hours, $360; for 24-48 hours, $960; for 48-72 hours, $1,800.  *Id.*  The jury

had been instructed as follows:  "In determining damages for false imprisonment, you

may consider both the length of time the plaintiffs were held and the treatment and

conditions of detention to which they were subjected, if they were in fact falsely

imprisoned."  *Id.*  at 208.  Working with a verdict form designed by the district court, the

jury's awards "took into account, in a rough way, the different experiences of different

members of the class, without losing administrative feasibility."  *Id.*

In yet another case, a district court certified and tried a class action involving claims

that plaintiffs had been unlawfully detained and strip-searched.  *Barnes v. District Of

Columbia*, 278 F.R.D. 14 (D.D.C. 2011).  Applying the "*Dellums* method" for determining

general damages for "the injury to human dignity," the jury assigned damages using "a

matrix based upon the length of overdetentions."  *Barnes*, 278 F.R.D. at 21.  With respect

to damages related to the unlawful strip search, the jury determined a monetary value for

each strip search.  *Id.*

Defendants argue that none of *Kerman*, *Nassau County*, *Dellums*, or *Barnes*

supports jury determination of class-wide damages in the instant case because those

cases involved Fourth Amendment issues, not due process claims as are at issue here,

and because they do not support an intrinsic "daily rate" for Plaintiffs' loss of liberty.  (Def.

Mem. at 14-19.[14])  In conclusory fashion, Defendants submit that "[d]ue process violations

arising out of delays in resentencing after *Early* are simply different from the constitutional

violations assaulting human dignity in *Nassau County* or free speech in *Dellums*."  (Def.

---

[14] "Def. Mem." refers to Defendants' memorandum Of Law In Response To Plaintiffs'
Briefing On Issues Pertaining To Any Classwide Damages Trial For Procedural Due
Process Violations Arising Out of PRS (Dkt. 329).

Mem. at 16; *see also* Def. Mem. at 2 (arguing that neither the case record nor legal precedent supports "bifurcation of a trial in a due process case as to class-wide general damages and individualized damages").)   Yet Defendants offer no logic, authority, or other basis to explain why the distinction in the constitutional right invoked is material in the instant case.

The Court observes that cases like *Nassau County*, *Dellums*, and *Barnes* involved discrete events (such as a strip-search) that occurred over a relatively short period of time (such as detention for a few hours).   In contrast, Plaintiffs assert unlawful detention and PRS restrictions over a period of days, months, or even more than a year.   But the fact that the present loss of liberty issues took place across a longer time period does not make determination of general damages on a class-wide basis less manageable.   There is no reason, for example, that a matrix or grid system similar to that used in *Dellums* and *Barnes* could not be used with the jury here.

Apart from their "simply different" argument, Defendants offer no contrary authority and attempt to deflect the precedent for class-wide general damages by rehashing arguments related to causation and compensatory damages that the Court already has addressed and resolved.   For instance, Defendants contend that "Defendants did not cause [Plaintiffs'] claimed damages" because "Plaintiffs cannot prove on a class-wide basis that, had they been referred for resentencing earlier, they would not have served their PRS terms."   (Def. Mem at 2, 9.)   But Plaintiffs' damages theory is not premised on any difference in timing of when PRS was unlawfully imposed, but rather that unlawful PRS should not have been imposed at all.   Judge Scheindlin already found that Defendants caused Plaintiffs' loss of liberty, *Betances II*, 144 F. Supp. 3d at 453, and

Defendants do not provide any factual or legal changes that would prompt a different outcome.

In short, general damages for Plaintiffs' loss of liberty can be determined on a class-wide basis.

### 3.     Common Issues Predominate

Having determined that general damages for loss of liberty can be assessed on a class-wide basis, the question then becomes whether that determination or individualized damages issues predominate.   The Court finds that Plaintiffs' common injuries predominate over other, individualized issues.   Plaintiffs seek damages for liberty restrictions imposed by PRS and liberty restrictions resulting from reincarceration.   At the same time, Plaintiffs have set boundaries on what they seek that enhance the predominance of  common issues.

Starting with PRS, Plaintiffs have clarified that they seek compensation for only the common mandatory Board of Parole conditions ("Common PRS Conditions") imposed on every individual subjected to PRS.[15]  (Dkt. 333 at 5.)  The Common PRS Conditions are universally enforced subject to New York law.  *See*  9 NYCCR § 8003.2.

With one exception, Plaintiffs expressly do not seek damages for "special conditions," which may be imposed under New York law at the parole officer's discretion. *See*  9 NYCCR § 8003.3.   The one exception is imposition of curfew, which, Plaintiffs assert, was applied to all Plaintiffs during the relevant period.   Defendants argue that "curfew requirements were individualized, as exceptions to curfew were routinely made … and, where applied, were frequently changed."  (Dkt. 333 at 4 n.8.)  Plaintiffs argue

---

[15] A full list of the Common PRS Conditions was included in the parties' joint submission to the Court at Dkt. 333.

that a class-wide trial for general damages may contain some level of variation, but the fact that all Plaintiffs were restricted in their homes for certain hours is enough to satisfy the commonality requirement.  The Court agrees.

The deprivation of liberty is a common harm endured by every member of the class.  Although Plaintiffs' experience of that deprivation varies in some ways – e.g. the type of facility where they were housed or the exact travel restrictions or curfew hours – the common injury is the loss of freedom to make certain choices, being confined to a residence, and limited in travel.  Some details of the restrictions may have varied, but ultimately every single Plaintiff was denied the ability to make those decisions for themselves.  That an individual was incarcerated in a city jail versus a state prison or limited to traveling within two states or three states are immaterial differences.[16]  Rather, all Plaintiffs had restrictions placed on their liberty, and the universal application of the Common PRS Conditions predominate over any individualized variations.

A second important boundary is that for Plaintiffs who were reincarcerated based on commission of a new crime, Plaintiffs seek damages only for the additional time imposed on top of whatever sentence was imposed in connection with the new crime. New York law provides that when a defendant violates terms of PRS by committing a new crime or otherwise during the PRS period, the defendant "shall [be] subject … to a further period of imprisonment up to the balance of the remaining period of post-release supervision."  N.Y. Penal Law § 70.45.  Reincarcerated Plaintiffs seek damages for that

---

[16] Differences in the number of hours of curfew may be accounted for by using a grid with ranges of hours, similar to what will be used for number of days of common PRS or unlawful reincarceration.

27

additional period or imprisonment imposed as a result of violating unlawfully imposed PRS, not for any time served in connection with the new offense.  (Dkt. 333 at 6.)

To be sure, there are myriad individualized damages claims, in addition to general damages, that Plaintiffs could pursue if they so choose.  Examples include emotional distress from particular experiences in prison during reincarceration, physical injuries and medical expenses incurred during reincarceration, or restrictions imposed by virtue of special PRS discretionary conditions.  Whether any Plaintiff will choose to do so is unknown.  But the prospect of such individualized claims is no reason not to proceed with class-wide trial of general damages.  *See*, *e.g.*, *Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 163 (E.D.N.Y. 2011) (decertifying the *Nassau County* strip-search class for resolution of individualized special damages following a bench trial on general damages); *Barnes*, 278 F.R.D. at 22 (noting that the class would be decertified after trial on general damages for determination of individualized special damages); *Myatt v. Fries*, No. 10-CV-64, 2013 WL 3776480, at *5 (N.D. Ind. July 17, 2013) ("after the conclusion of the general damages findings, the Court will decertify the class" as to specific class members who timely submitted a claim form); *Price v. City Of Seattle*, No. C03-1365, 2006 WL 2691402, at *8 (W.D. Wash. Sept. 19, 2006) (following concession of liability, court denied decertification as to one type of damage while granting decertification as to two types of individualized damages).  Once general damages have been tried, the class can then be decertified.  Doing so now, however, would be premature.

## C.    A Class Action Remains A Superior Method At This Juncture

Having concluded that general questions of law and fact predominate over individualized issues, the Court now discusses whether a class action is a superior

method for resolving general damages for purposes of maintaining the class pursuant to Rule 23(b)(3).  The Court finds that it is.

Rule 23(b)(3) enumerates four factors courts should consider to determine superiority: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).  The four factors are non-exhaustive.  *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 422 (S.D.N.Y.), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (describing the factors as "non-exhaustive"); *Meyer v. U.S. Tennis Association*, 297 F.R.D. 75, 89 (S.D.N.Y. 2013) (same). "[A]ssessing superiority is a fact-specific inquiry.*" In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 264 (2d Cir. 2016).  The Court addresses each factor in turn.

First, there is no evidence that individual class members would prefer to control the prosecution of their claims for general damages through separate lawsuits.  Any individual plaintiffs who wish to proceed to trial for individualized damages following the class-wide trial for general damages will be free to so do.

Second, although the Court is aware that a number of individual Section 1983 actions involving unlawful PRS have been litigated in federal court, the Court is not aware of any litigation regarding the issue here already in process against or commenced by the class members.  This factor does not counsel against the superiority of a class action. *See In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015) (finding class action was superior to other non-adjudicative forms of redress and noting "there has been

no other litigation concerning the controversy already commenced by or against members of the class").

Third, there is little to suggest that concentrating the litigation in this forum is undesirable.  Jurisdiction and venue are appropriate, and the parties have spent over a decade litigating the case in this Court.

The fourth factor, manageability, "is an issue peculiarly within a district court's discretion."  *Seijas v. Republic Of Argentina,* 606 F.3d 53, 58 (2d Cir. 2010).  "[M]anageability is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication."  *Sykes v. Mel S. Harris And Associates LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal citation omitted).  The fact that this case already has been successfully litigated in this Court through many stages suggests that proceeding through one more stage addressing class-wide damages will be eminently manageable.

All four factors counsel in favor of finding that a class action remains the superior method of adjudication for determination of class-wide general damages.  Pursuing general damages on a class-wide basis also serves the pragmatic objectives of Rule 23. Given the nature of the case and the Plaintiffs past (and in some instances present) status as prisoners or supervised releasees, it is unlikely that most of them would have the wherewithal to bring an action on their own.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246 (1997) ("the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." (internal quotation marks omitted)); *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 130-31 (2d Cir.

2013) ("class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery").

In sum, maintaining a class action for purposes of determining class-wide general damages will achieve significant economies of "time, effort and expense, and promote uniformity of decision."  *Id*. (citing Rule 23 advisory committee's notes).  The requirements of Rule 23(b) are satisfied.

## D.      The Rule 23(a) Typicality Requirement Remains Satisfied

Defendants contend that the individualized experiences of the three named Plaintiffs render them atypical of other class members.  The typicality element of Rule 23(a) "requires that the claims of the class representatives be typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quotation marks and citations omitted). Judge Scheindlin determined exactly that, stating in her decision previously certifying the class, "[a]lthough the specific circumstances of the class members differ with regard to when PRS was imposed and the various terms of supervision, … *all* terms were imposed after *Earley,* pursuant to defendants' policy.  The claims of the lead plaintiffs are therefore "typical" of those of all class members." *Betances Class Opinion*, 304 F.R.D at 428.  Here, each class member's claim derives from the unlawful administrative enforcement of PRS on individuals whose sentences did not include a term of PRS.  There is no question that the named Plaintiffs, like all other class members, suffered a loss of liberty due to the Defendants' policy.

In support of their argument, Defendants focus on the particular circumstances of each named Plaintiff to distinguish them from other class members.  For instance, with

respect to named Plaintiff Paul Betances, Defendants contend that he "did not serve any time on PRS that was *not* judicially-imposed or subject to a court hold."  (Def. Mem at 34.) Whatever time he did serve, Defendants argue, was 20 days at a drug treatment facility. Whether or not that is so, confinement to such a facility still entails a 20-day loss of liberty. Defendants also argue that Betances is entitled at best to only nominal damages.  The Court previously decided, however, which class members are limited to nominal damages, and which may seek compensatory damages.  Betances falls into the latter category.

With respect to named Plaintiff Lloyd Barnes, Defendants assert that he served PRS in the community and did not serve time in jail as a result of unlawful PRS because any time he spent in jail was attributable to another crime.  As explained above, however, Plaintiffs do not seek damages for any time incarcerated due to commission of another crime.  And even if Defendants were correct, Barnes would be typical of the approximate 1,644 class members (excluding *Nunc Pro Tunc* Plaintiffs entitled only to nominal damages) who were subject to unlawful PRS but not reincarcerated. (*See* Dkt. 333 at 2.)

As for Plaintiff Gabriel Belize, Defendants argue that he is typical only of other plaintiffs who served PRS in the community, and was reincarcerated at a city jail pending determination of an alleged parole violation until released.  But that effectively concedes the attributes material to the approximate 652 class members (excluding *Nunc Pro Tunc* members entitled only to nominal damages) who were subject to unlawful PRS and subsequently reincarcerated for a violation of PRS.[17]  (*See* Dkt. 333 at 2.)

---

[17] Defendants also challenge the typicality of witness Shawn Smith, who Plaintiffs expect to testify at trial.  That challenge, however, is premised on a misguided argument that

The distinctions that Defendants draw – e.g., confinement to a city jail vs. state prison; a facility that provided drug treatment vs. one that did not, etc. – cut too fine for purposes of determining loss of liberty and do not make the named Plaintiffs any less typical than they were at the outset of the case when Judge Scheindlin certified the class. As discussed above, all three named Plaintiffs, like the plaintiff class they represent, were unlawfully subjected to the Common PRS Conditions and, in some cases reincarceration, and as a result experienced a loss of liberty.[18]   The variations of that loss of liberty on which Defendants focus do not defeat typicality.  *See e.g.*, *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 365 (S.D.N.Y. 2014) ("To the extent that the defendants emphasize the individualized inquiries that may be necessary to establish liability and damages, any such inquiries do not defeat a finding that the named plaintiffs' claims are typical of those of the proposed Subclass"); *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) ("Typicality is satisfied despite differences in damages arising from a disparity in injuries among the class members.  Where the named plaintiff as well as members of the proposed class all have similar claims arising from the same scheme, the typicality requirement is satisfied regardless of whether different facts underlie each class member's claim" (internal quotation marks omitted); *Koss v. Wackenhut Corp.*, No. 03-CV-7679, 2009 WL 928087, at *6 (S.D.N.Y. March 30, 2009) (rejecting Defendants' arguments against on typicality that "some individualized determinations will be required" because "individual differences do not preclude certification of a class where, as here,

---

Defendants did not cause Smith's unlawful term of PRS and that Smith is entitled only to nominal damages – even though he is not among the *Nunc Pro Tunc* Plaintiffs.

[18] To be clear, the jury will be asked to separately evaluate loss of liberty while subject to PRS and loss of liberty while reincarcerated.

each Plaintiff's claim arises from the same set of facts, and rests on similar legal arguments").

The named Plaintiffs remain typical of the class, thus satisfying the last element of Rule 23(a).  As the requirements of both Rule 23(a) and 23(b)(3) are satisfied, the Court declines to decertify the class.  Trial will be held on class-wide general damages for loss of liberty.  The class can be decertified after that for purposes of pursuing individualized damages issues.

## CONCLUSION

For the foregoing reasons, the Court finds that the class should be maintained for the purposes of trial to determine general damages for loss of liberty.  Defendants' motion to decertify the class at this juncture is therefore denied.  To the extent not discussed above, the Court has considered the Defendants' arguments and finds them to be without merit.  Within fourteen days of entry of this decision, the parties shall file a joint letter setting forth (1) a schedule for completing notice to the class, (2) a schedule for filing any outstanding pre-trial materials required by this Court's individual rules, (3) a description of any remaining pre-trial in limine issues that have not been resolved, and (4) dates during the third quarter of 2022 when the parties are not available for trial.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: March 14, 2022
       New York, New York

Copies transmitted this date to all counsel of record.