UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PAUL BETANCES, et al., individually :
and on behalf of others similarly situated, :
                                        :
                           Plaintiffs,  :
                                        :
             - against -                :
                                        :
BRIAN FISCHER, in his capacity as       :
Commissioner of the New York State      :
Department of Correctional Services (DOCS), :
and in his individual capacity, et al., :
                                        :
                          Defendants.   :
------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: 1/17/2024            │
└─────────────────────────────────┘
```

11-CV-3200 (RWL)

**DECISION AND ORDER**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

For more than a decade, Paul Betances, Lloyd A. Barnes, and Gabriel Velez ("Named Plaintiffs") – individually and on behalf of others similarly situated (together, "Plaintiffs") – have prosecuted this class action against Brian Fischer, Anthony J. Annucci, and Terrence Tracy ("Defendants") for violating their due process rights.  Plaintiffs seek redress for Defendants' wrongful enforcement of unlawfully imposed terms of post-release supervision ("PRS").  Defendants already have been found personally liable, a decision affirmed by the Second Circuit Court of Appeals.  Most recently, the case was poised for trial to determine loss-of-liberty damages on a class-wide basis.  In the interim, however, the Second Circuit issued a decision that addressed determination of damages in wrongful-PRS cases such as this one.  *See Vincent v. Annucci*, 63 F. 4th 145 (2d Cir. 2023) ("*Vincent*").

To assess the implications of *Vincent* for trial of damages in the instant action, the parties, at the Court's request, have cross-moved for partial summary judgment on the

extent to which, if at all, any legal or practical impediments delayed Defendants' ability to release Plaintiffs from unlawful PRS and from reincarceration after violation of unlawful PRS.  The parties also have cross-moved on two additional issues, namely whether the subclass of class members who were resentenced to PRS *nunc pro tunc* may recover more than nominal damages; and, whether *Vincent* has any implications for continuing as a class action for general loss-of-liberty damages.  Having considered the parties' briefs, evidence, and arguments, the Court now resolves these issues as set forth below.

## BACKGROUND[1]

The facts and history of this case have been summarized in several prior opinions.[2] The Court sets forth below only the information most relevant to the instant motions.

---

[1] The facts are drawn from previous decisions in this case, the parties' statements of material fact and corresponding responses pursuant to Local Civil Rule 56.1, the evidence submitted by the parties, and the record.  The facts are undisputed unless otherwise indicated.  The Court uses the following naming conventions: "Def. 2023 56.1 Resp." refers to Defendants' Response To Plaintiffs' 56.1 Statement, filed August 14, 2023 (Dkt. 405) (including both Plaintiffs' asserted statements and Defendants' responses); "Pl. 2023 56.1 Resp." refers to Plaintiffs' Response To Defendants Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1, filed August 30, 2023 (Dkt. 412) (including both Defendants' asserted statements and Plaintiffs' responses); "Bourland Decl." refers to the Declaration of Nick Bourland filed June 23, 2023 (Dkt. 391); "Fischer Decl." refers to the Declaration of Brian Fischer, filed August 14, 2023 (Dkt. 401); "Annucci Decl." refers to the Declaration of Anthony J. Annucci, filed August 14, 2023 (Dkt. 402); "Tracy Decl." refers to the Declaration of Terrence Tracy, filed August 14, 2023 (Dkt. 403); and "Keane Decl." refers to the Declaration of Michael J. Keane, filed August 14, 2023 (Dkt. 406-08).  The Court also draws upon sworn testimony from earlier proceedings.  "2015 Annucci Decl." refers to the Declaration of Anthony J. Annucci, filed May 8, 2015 (Dkt. 91).

[2] *See Bentley v. Dennison*, 852 F. Supp.2d 379 (S.D.N.Y. 2012) ("*Bentley*") (denying Defendants' motion to dismiss based on qualified immunity in both this class action and a related action with individual plaintiffs), *aff'd sub nom*, *Betances v. Fischer*, 519 F. App'x 39 (2d Cir. 2013) ("*Betances I*"); *Betances v. Fischer*, 304 F.R.D. 416 (S.D.N.Y. 2015) ("*Betances Class Opinion*"); *Betances v. Fischer*, 144 F. Supp.3d 441 (S.D.N.Y. 2015) ("*Betances II*") (summary judgment finding Defendants personally liable for violating Plaintiffs' constitutional rights); *Betances v. Fischer*, 837 F.3d 162 (2d Cir. 2016) ("*Betances III*") (affirming *Betances II* and remanding for appropriate remedies); *Betances v. Fischer*, 403 F. Supp.3d 212 (S.D.N.Y. 2019) ("*Betances IV*") (granting Defendants'

## A.       The Parties

Plaintiffs were convicted of violent felonies and sentenced by New York State courts.  Although state law required courts to impose a term of PRS for such convicted felons, the court-ordered sentencing and commitment orders for Plaintiffs did not include any term of PRS.  Upon taking custody of Plaintiffs, however, the administrators responsible for incarceration and parole added PRS terms to their sentences.  After being released from prison, class members were compelled to comply with the restrictions of administratively imposed PRS, and in many cases, were reincarcerated for a period of time based on their violation of the terms of administratively imposed PRS.

Defendants are the three individuals remaining in the case based on their having enforced administratively imposed PRS, despite their awareness that administratively imposed PRS was unconstitutional.  Anthony Annucci was counsel for New York Department of Correctional Services ("DOCS") from September 1989 until October 2007, when he became deputy commissioner and counsel, a position he served until December 2008. (Def. 2023 56.1 Resp. ¶ 2.)  Brian Fischer served as commissioner of DOCS from January 2007 to April 2011. (Def. 2023 56.1 Resp. ¶ 1.)  Terrence Tracy was the chief counsel for the New York Division of Parole ("DOP") from December 1996 until March 2011.[3]  (Def. 2023 56.1 Resp. ¶ 3.)  During the relevant time period, DOCS took custody

summary judgment limiting certain class members to nominal damages but denying the motion in all other respects, including as to class decertification); *Betances v. Fischer*, 2022 WL 765963 (S.D.N.Y. March 14, 2022) ("*Betances V*") (denying Defendants' motion for class decertification); *Betances v. Fischer*, 2023 WL 2609133 (S.D.N.Y. Mar. 23, 2023) (*Betances VI*) (finding that failure-to-mitigate defense did not warrant decertification).

[3]  In 2011, Parole and DOCS merged to create the Department of Correction and Community Supervision.  (Def. 2023 56.1 Resp. ¶ 1.)  The merger occurred after the relevant events giving rise to this lawsuit and does not affect analysis of the issues at bar.

of defendants for their initial imprisonment and for reincarceration after violations of PRS. DOP was responsible for enforcing PRS.  *Betances III*, 837 F.3d at 165; *see also Vincent v. Yelich*, 718 F.3d 157, 160 (2d Cir. 2013) ("*Yelich*") (while "the practice of re-incarcerating persons who violated their administratively-imposed PRS was a practice of the Division of Parole, and not of DOCS," DOCS's "ensuing custody of [inmates] for such violations was unlawful").

## B.    Post-Release Supervision

In 1998, the New York Legislature passed "Jenna's Law," a sentencing scheme for defendants found guilty of certain violent felonies mandating that each determinate sentence of incarceration also include an additional period of PRS.  *See* N.Y. Penal Law § 70.45(1) (McKinney 1998).  Some judges, however, did not pronounce PRS during sentencing proceedings.[4]  *Betances III*, 837 F.3d at 165.  As a result, some defendants entered DOCS custody without a judicially imposed sentence of PRS. *Id.* Instead of informing the sentencing court of this omission, however, DOCS "simply added the PRS term administratively."  *Id.*

Doing so was merely a matter of paperwork and computer entry.  When received by DOCS, inmates were accompanied by their pre-sentence report, a list of their criminal history, and a sentence and commitment order ("commitment order").[5]  (Pl. 2023 56.1

---

[4] Jenna's Law was amended in 2008 to explicitly require sentencing judges to state on the sentencing record both the term of imprisonment and the additional period of post-release supervision.  N.Y. Penal Law § 70.45(1).

[5] Commitment orders had various names.  For instance, in some counties, a commitment order was referred to as a "Sentence and Commitment," whereas in others it was named a "Sentence and Order of Commitment."  (Pl. 2023 56.1 Resp. ¶ 6.)

Resp. ¶ 5.)  Defendants admit that DOCS calculated inmates' sentences "based upon the information on the sentence and commitment sheets that accompanied them to prison." (Pl. 2023 56.1 Resp. ¶ 4.)  *See Betances III*, 837 F.3d at 165 ("DOCS employees routinely entered information about the inmate's sentence from [the relevant document] into the DOCS computer system").  Nevertheless, if a commitment order was silent as to PRS, and DOCS believed that PRS should have been automatically included pursuant to Jenna's law, DOCS took it upon themselves to impose PRS when inputting the relevant information into its computer systems.[6]  (Def. 2023 56.1 Resp. ¶¶ 11, 13.)  *See Betances III*, 837 F.3d at 165 ("If a sentence and commitment order did not include the PRS term that § 70.45 required, DOCS employees, following guidelines issued by DOCS, entered for the inmate the shortest PRS term permitted by § 70.45").

Operations then ran as usual with DOCS informing DOP, near an inmate's prison release date, of the dates and duration of that inmate's PRS. DOP then supervised the former inmate while on PRS. *Betances III*, 837 F.3d at 165.  If a former inmate released on PRS violated their terms of PRS, "DOCS and DOP were authorized to reincarcerate

---

[6] Throughout their responses to Plaintiffs' statements of undisputed fact, Defendants deny that DOCS ever "imposed" PRS and instead "calculated" a sentence that the court was required to impose.  (*See, e.g.,* Def. 2023 56.1 Resp. ¶¶ 11, 15, 17, 26-28, 30, 36, 38-40, 43-46, 48-50, 54-57, 59-64.)  Defendants' objection to the term "imposed" is frivolous. The Second Circuit's decisions addressing Defendants' liability repeatedly have couched their conduct in terms of DOCS having unlawfully "imposed" or "added" PRS.  *See*, *e.g.*, *Yelich*, 718 at 160; *Betances III*, 837 F.3d at 170; *Hassell v. Fischer*, 879 F.3d 41, 47 (2d Cir. 2018); *Vincent,* 63 F.4th at 148.  This is not the first time Defendants have peppered their summary judgment papers with suspect objections and denials.  *See Betances II*, 114 F. Supp.3d at 445 n.5 (finding Defendants' blanket objections in response to Plaintiffs' 56.1 statement in 2015 to be "in the main, utterly frivolous and border[ing] on bad faith").

an offender who, after a hearing, was found to have violated the conditions of release." *Id*.

## C.    Administrative Imposition Of PRS Held Unconstitutional

On June 9, 2006, the Second Circuit Court of Appeals held that administrative imposition of PRS was unconstitutional.[7]  *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006), *rehearing denied*, 462 F.3d 147 (2d Cir. Aug. 31, 2006) ("*Earley*"), *cert. denied*, 551 U.S. 1159 (2007).  As the Second Circuit later explained in *Betances III*, "the Constitution forbids DOCS from modifying a sentence imposed by a judge," including in cases where DOCS administratively modified a sentence to add a period of PRS where such a term was mandated by Jenna's Law but had not been imposed by a sentencing judge. *Betances III*, 837 F.3d at 165 (citing *Earley*, 451 F.3d at 74-76); *see also Yelich*, 718 F.3d at 166 (holding that *Earley* clearly established the unconstitutionality of administratively imposed PRS).

As a consequence of its constitutional impropriety, any PRS imposed by DOCS was rendered "null and void."  *Vincent*, 63 F.4th at 148; *see also Betances III*, 837 F.3d at 166 (PRS imposed by DOCS was a "nullity").  Upon *Earley*'s holding, "[i]t was incumbent on the state to rectify the constitutional violations that were ***ongoing*.*"  *Vincent*, 63 F.4th at 152 (emphasis in original).  More particularly, the state was required to either arrange for convicts to be "resentenced by the court for the imposition of PRS terms in a ***constitutional*** manner or … excise the PRS conditions from their records and relieve

---

[7] Throughout this opinion, the Court uses interchangeably various terms referring to PRS that was unlawfully imposed, including "administratively imposed PRS," "unconstitutional PRS," "wrongful PRS," and "unlawful PRS."

them of those conditions." *Id.* (emphasis in original).  While both those remedies were available to individuals whose determinate sentences had not yet expired, only the latter option – excision of and release from PRS – was available for individuals, like many Plaintiffs, "who had served their judicially imposed determinate sentences and had been released from custody, only to be re-incarcerated for violating the terms of their administratively imposed PRS." *Id.* at 152.

**D.     Defendants' Deliberate Failure To Timely Comply With Earley**

Annucci, Fischer, and Tracy each had the ability and authority to immediately take steps to discontinue imposing and enforcing unlawfully imposed PRS.  Yet, rather than comply with *Earley*, they defied it.  The Second Circuit has repeatedly admonished the three Defendants for their recalcitrance:   "The defendants [(including Fischer and Annucci)] have appeared before this Court many times regarding their imposition of PRS, and their deliberate refusal to follow *Early I*'s holding is well documented."   *Reyes v. Fischer*, 934 F.3d 97, 101 (2d Cir. 2019).  Indeed, the Second Circuit recently held that punitive damages are available and "may be especially appropriate" for Defendants' failure to cease imposing and enforcing unlawful PRS.  *Aponte v. Perez*, 75 F.4th 49, 56 (2d Cir. 2023); *see also Santiago v. Fischer*, No. 12-CV-2137, 2023 WL 2974201, at *14 (E.D.N.Y. Apr. 16, 2023) (upholding jury's punitive damages award for wrongful PRS and finding each Defendant's conduct to be "reprehensible … as it was repeated, reckless and culminated in depriving Plaintiff's liberty and thousands of others of their liberty).

What could Defendants have done to comply with *Earley*?  First, DOCS could have immediately discontinued imposing PRS where commitment orders were silent on the subject.  Nothing prevented Defendants from doing so.  (Def. 2023 56.1 Resp. ¶ 36.)

Second, DOCS and DOP could have immediately reviewed their files to determine which individuals were already subjected to PRS even though their commitment order did not include a PRS term.  (Def. 2023 56.1 Resp. ¶¶ 35, 37.)  DOCS undertook such a review in 2007, and it took only four to six weeks.  (Def. 2023 56.1 Resp. ¶¶ 56-61.) Ultimately, DOCS determined that for 8,100 individuals currently serving sentences or released to PRS, "the sentence and commitment order was silent as to PRS, leading to the conclusion that DOCS had added the terms to these inmates' sentences." *Betances* III, 837 F.3d at 169.  But instead of acting on that information, DOCS employees "simply sat on the information they had collected." *Id.* at 172.  For its part, DOP needed less than a week to review the files of all individuals under their supervision to determine whether their commitment orders reflected judicially imposed PRS, but did not conduct that review until June 2008.  (Def. 2023 56.1 Resp. ¶ 68.)

Third, following review of the files, DOCS could have excised PRS from the records of the individuals identified; no impediment prevented DOCS from doing so.  (Def. 2023 56.1 Resp. ¶¶ 36, 38.)    As Fischer testified:

> Q.  And then one thing you could have done at that point in time [having identified all people affected by the policy of administratively imposed PRS] was just remove the PRS from all those people that had been imposed pursuant to the DOCS policy that it was now clear was inconsistent at least with Earley versus Murray, right?  That's one option that you had?
>
> A.  Yes.
>
> Q.  And as I understand your testimony your decision was to not do that, right?
>
> A.  Correct.

(Bourland Decl. Ex. B at 82:18-83:7; *see also id.* at 222:21-224:2 (Fischer admitting that he and his predecessors had "the authority and the power" to recalculate sentences for anyone subject to PRS imposed by DOCS).)  Similarly, Annucci conceded that, based on complete information, he could have "nullified any DOCS sentences to PRS that were inconsistent with the commitment orders," although he probably would have first consulted with the Commissioner of DOCS and possibly the Governor's office.  (Bourland Decl. Ex. C at 167:7-168:2.)

Defendants were not alone in their non-compliant response to *Earley*.  For instance, some district attorneys did not seek resentencings in cases involving PRS, not even for Earley.  (Pl. Resp. 2023 56.1 ¶¶ 2-3.)  And the state courts "were inconsistent" in following *Earley*, with two of the four departments adhering to *Earley*, while the other two initially did not apply its holding.  *Betances III*, 837 F.3d at 166.

## E.    Action Upon Change In New York Law

Despite their constitutional obligations as established in *Earley*, DOCS did not act to address unlawful PRS until May 2008 in response to two New York Court of Appeals decisions holding that administrative imposition of PRS violated New York law.  S*ee Matter Of Garner v. New York State Department Of Correctional Services*, 10 N.Y.3d 358, 362-63, 859 N.Y.S.2d 590, 592-93 (2008) (prohibiting DOCS from imposing PRS); *People v. Sparber*, 10 N.Y.3d 457, 469-70, 859 N.Y.S.2d 582, 587 (2008) (finding that the administrative addition of PRS was not a valid statutory interpretation of New York law). At that time, "DOCS launched a 'Post-Release Supervision Resentencing Initiative' to obtain resentencing of individuals in its custody whose sentencing judges had not pronounced PRS terms required by § 70.45."  *Betances III*, 837 F.3d at 169.  As part of

the initiative, in addition to reviewing the data already collected indicating which inmates had commitment orders that were silent about PRS, DOCS sought to obtain the sentencing minutes of all 8,100 individuals to determine if the sentencing judge had orally pronounced PRS even if it was not recorded in the inmate's commitment order. *Id*. at 169. DOCS also notified courts and district attorneys of inmates who might need resentencing, and, with DOP, brought a declaratory judgment action seeking judicial approval of a mass-resentencing plan. *Id*. at 171-72.

In June 2008, the New York State Legislature amended New York criminal law to establish a process for DOCS and Parole to refer for resentencing inmates who appeared to have had PRS unlawfully added to their sentencing.[8] (Pl. 2023 56.1 Resp. ¶¶ 25-26.) See N.Y. Correction Law § 601-d. In order to not overwhelm the courts, DOCS, DOP, and the Office of Court Administration entered into a memorandum of understanding that required defendants be sent back to their sentencing courts in phases. (Pl. 2023 56.1 Resp. ¶ 27.) By January 2009, almost all relevant individuals had been referred to their sentencing courts; some were resentenced with PRS, some with abbreviated PRS, and some without PRS. (Def. 2018 56.1 ¶ 17.[9]) Ultimately, "it [had taken] Annucci 19 months, Tracy 15 months, and Fischer 14 months to take the first meaningful steps to bring their departments into compliance with Earley I." Betances III, 837 F.3d at 172. "All three

---

[8] Many of those affected by an unlawful PRS had previously pled guilty. The new legislative scheme was established in part to avoid vacatur of guilty pleas in cases where PRS was administratively imposed. *People v. Catu*, 4 N.Y.3d 242, 245, 792 N.Y.S.2d 887, 888-89 (2005); *see also Sparber*, 10 N.Y.3d at 471-72, 859 N.Y.S.2d at 588-89.

[9] "Def. 2018 56.1" refers to Defendants' August 10, 2018 Statement Of Undisputed Material Facts Pursuant to Rule 56.1 (Dkt. 200).

confirmed that their noncompliance was not the result of oversight or confusion; they understood that Earley I required them to change their practices but affirmatively decided not to do so."  Id.  And all three Defendants "admitted that nothing prevented them from taking [the] same actions [they eventually took] when they first understood the requirements of Earley I."  Id.

In February 2010, the New York Court of Appeals held that the Double Jeopardy and Due Process Clauses of the United States Constitution barred resentencing (for the purpose of judicially imposing PRS) on defendants who had served their determinate term of imprisonment and had been released from confinement by DOCS.  *People v. Williams*, 14 N.Y.3d 198, 217, 899 N.Y.S.2d 76, 87 (2010).

## PROCEDURAL HISTORY

### A.    Proceedings Prior To The Second Circuit's Vincent Decision

Plaintiffs commenced this action on May 11, 2011, alleging that administrative imposition of PRS, and enforcement of that PRS, violated their constitutional rights under the Fourth and Fourteenth Amendments.  (Complaint ("Compl."), Dkt 1.)  Plaintiffs' claims survived Defendants' motion to dismiss based on qualified immunity, and the Second Circuit affirmed Judge Scheindlin's analysis that *Earley* "clearly established that the administrative imposition of post-release supervision terms not imposed by the court is unconstitutional."  *Betances I*, 519 F. App'x at 41; *see also Bentley*, 852 F. Supp. 2d at 386.

On January 28, 2015, Judge Scheindlin certified a class of "individuals who were convicted of various crimes in New York State courts on or after September 1, 1998; were sentenced to terms of incarceration but not to terms of PRS; but were nonetheless subjected to enforcement by defendants of PRS terms after the maximum expiration

dates of their determinate sentences after June 9, 2006" (when *Earley* was decided). *Betances Class Opinion*, 304 F.R.D. at 427. The Court determined that liability and general damages for loss of liberty should be resolved on a class basis, while individualized damages issues could be addressed in the future by, for example, decertifying the class. *Id.* at 432.

Following class certification, the parties cross-moved for summary judgment on the merits. (Dkts. 90, 100.) Judge Scheindlin granted Plaintiffs' motion and found Defendants Annucci, Fischer, and Tracy personally liable for violating Plaintiffs' due process rights. *Betances II*, 144 F. Supp. 3d at 453. The Second Circuit affirmed the decision, stating "we agree with the district court that the defendants did not make an objectively reasonabl[e] effort to relieve plaintiffs of the burdens of those unlawfully imposed terms [of PRS] after they knew it had been ruled that the imposition violated federal law."[10] *Betances III,* 837 F.3d at 174 (internal quotation marks and modifications removed).

With liability determined, the only remaining issues concern damages. Plaintiffs seek damages for the time they were wrongfully subject to the restrictions of PRS and incarcerated based on PRS violations, including the commission of new crimes. They do not seek damages for the time they were incarcerated for the underlying crimes that led to their being newly arrested and incarcerated.

On August 10, 2018, Defendants filed a motion for partial summary judgment on several issues and to modify or decertify the class. (Dkt. 199.) On February 21, 2019,

---

[10] The Second Circuit held that Defendants could not be held liable for any period of time prior to August 31, 2006, the date when the Court denied Defendants' motion for reconsideration in *Earley*. 837 F.3d at 172.

the Court denied summary judgment on all issues except one pertaining to nominal damages and denied decertification.  *Betances IV*, 403 F. Supp.3d 212.  In discussing damages, the Court categorized the plaintiffs into three groups:  Plaintiffs who were reincarcerated based on a violation of their unlawful PRS ("Incarcerated Plaintiffs"); Plaintiffs who were subject to illegal PRS but who were not subsequently incarcerated for violating that PRS ("PRS Only Plaintiffs");[11] and Plaintiffs who were referred for resentencing and received the same terms of PRS *nunc pro tunc* as they had received under unconstitutionally-imposed PRS ("*Nunc Pro Tunc* Plaintiffs").  *Id*. at 230-32.  The Court held that Incarcerated Plaintiffs and PRS Plaintiffs were not limited to nominal damages, while *Nunc Pro Tunc* Plaintiffs were limited to nominal damages.  *Id*. at 230-34.

The Court denied Defendants' request to decertify the class.  In so doing, the Court noted that Judge Scheindlin previously had certified the class with the expectation damages for loss of liberty would be included in the class phase.  *Id*. at 237.  Defendants did not present any new evidence or authority to depart from a class trial on general damages for loss of liberty.  *Id*. at 238.  At the same time, the Court recognized that certain issues were not yet sufficiently developed to fully resolve the matter.  *Id.*

---

[11] Within the PRS Only Plaintiff group, the Court identified three subgroups based on procedural differences: (1) Plaintiffs who prevailed on an Article 70 or Article 78 proceeding and had their PRS excised; (2) Plaintiffs who were referred for resentencing but the sentencing judge imposed no or only an abbreviated term of PRS; and (3) Plaintiffs not referred for resentencing (or referred too late) but who were relieved of their PRS following the New York Court of Appeals decision in *People v. Williams*, 14 N.Y.3d 198, 899 N.Y.S.2d 76 (2010).

In 2021, Defendants moved again to decertify the class, arguing that individual damages issues predominate.  (Dkt. 307.)  Plaintiffs opposed, and on March 14, 2022, the Court denied Defendants' motion, reasoning that the class could be maintained for damages for loss of liberty.  *Betances V*, 2022 WL 765963, at *13.  The Court explained Judge Scheindlin's previous reasoning in certifying the class at the outset, noting that in *Kerman v. City Of New York*, 374 F.3d 93, 125 (2d Cir. 2004), the Second Circuit recognized that general damages could be awarded for loss of liberty independent of other types of harms.  *See* 2022 WL 765963, at *2-3. The Court then described analogous cases in which courts proceeded with class actions for loss-of-liberty or similar damages for wrongful strip searches and detentions.  *See Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) (damages for false arrest and imprisonment based on number of hours and conditions of detention); *Barnes v. District Of Columbia*, 278 F.R.D. 14 (D.D.C. 2011) (damages for injury to human dignity based on length of unlawful detention and value for each strip search); *In re Nassau County Strip Search Cases*, No. 99-CV-3126, 2008 WL 850268, at *3-7 (E.D.N.Y. March 27, 2008) (general damages for loss of dignity for unlawful strip search).

On November 17, 2022, the Court held a pre-trial conference to address motions in limine and other issues for trial.  Among the issues decided was Plaintiffs' motion in limine to exclude any argument and testimony concerning Defendants' liability and the element of proximate cause.  (*See* Dkt. 306 at 4.)  As Defendants already had been held liable to Plaintiffs on summary judgment, the Court granted Plaintiffs' motion and denied

Defendants' related motion to include testimony and argument concerning causation.[12] (Dkt. 364 at 2.)  Following additional briefing, on March 23, 2023, the Court denied Defendants' renewed motion to decertify the class premised on their defense of Plaintiffs' failure to mitigate damages.  The Court found that while mitigation could be a relevant defense for individual damages claims, it was not relevant for trial of general damages for loss of liberty.  *Betances VI*, 2023 WL 2609133, at *4 (S.D.N.Y. Mar. 23, 2023).

## B.   Vincent

The next day, the Second Circuit issued its decision in *Vincent*.  Vincent, like the current Plaintiffs, was subject to unlawful PRS.  After completing his judicially determined sentence in 2005, Vincent was arrested and reincarcerated for violating the terms of his unlawful PRS.  63 F.4th at 148.  In 2006, while Vincent was still in custody, the Second Circuit decided *Earley*.  By form letter dated June 1, 2008 – nearly two years after *Earley* – Annucci advised Vincent's sentencing judge that he had not imposed PRS in 2001 and requested a hearing to determine whether to resentence Vincent or direct DOCS to release him.  *Id*.  The state sentencing judge never resentenced Vincent nor issued an order in response to Annucci's letter.  *Id.*  Vincent ultimately was released only as a result of his successfully filing a state habeas petition in July 2008.  *Id.*

---

[12] In a footnote in *Betances III*, the Second Circuit expressly left open the question of "how, if at all, the actions of others might inform any assessment of causation for specific injuries claimed by plaintiffs against these defendants."  837 F.3d at 174 n.2. Consistent with the Second Circuit's footnote, and while not permitting a wholesale revisiting of causation, this Court left open the opportunity for Defendants to argue at individual damages trials that certain individual injuries may be due to the action of others and therefore not attributable to Defendants.  *Betances IV*, 403 F. Supp.3d at 235.  As discussed below, *Vincent* requires a broader examination of damages causation concerning impediments to Defendants' ability to immediately and unilaterally discontinue enforcement of unlawful PRS.  The Court vacates its earlier decision regarding causation to the extent it is inconsistent with *Vincent.*

Vincent sued for compensatory damages.   On summary judgment, Annucci argued, inter alia, that Vincent was entitled to no more than nominal damages because "Vincent was at most 'deprived of his due process right to have a judge pronounce his PRS term' and would have remained incarcerated anyway, so he suffered no actual injury for which he could be compensated." *Id*. at 150.  The district court rejected that argument, reasoning that "'but for Annucci's failure to promptly excise Vincent's PRS or to refer him for curative resentencing,' Vincent might have been spared some part of the 686 days he was incarcerated." *Id*.  The district court then held a hearing on damages and awarded Vincent $175,000.  *Id*.

The Second Circuit, in a two to one decision, reversed in part and remanded for further consideration of damages.  As relevant here, the Court held that the district court gave only "cursory treatment" to damages causation.  *Id*. at 152. The district court "improperly declined to consider what steps were feasibly and legally available to Annucci, did not discuss Vincent's burden of proving damages, and did not determine whether Vincent had met that burden." *Id*.  The Second Circuit acknowledged that in response to *Earley*, the state was required to either refer individuals for resentencing or excise their wrongfully imposed terms of PRS.  *Id*.  The Court held, however, that resentencing *nunc pro tunc* was **not** an option for individuals, like Vincent, who had completed their determinate sentence before being reincarcerated for violation of unconstitutionally imposed PRS.  *Id*. at 153.  "For defendants like Vincent, resentencing was not an available corrective measure for the simple reason that their incarceration was a consequence of an unconstitutional sentence that DOCS, not the **court**, had imposed." *Id*. (emphasis in original).

With resentencing off the table as a curative option, "[t]he remaining option … was to excise the term of the null and void administratively imposed PRS and relieve Vincent of the conditions associated with it." *Id.* at 154. But that left one open question: "whether DOCS needed court approval to eliminate the PRS term that it alone had imposed." *Id.* On the record before the court, it [was] not clear whether there was any ***impediment, legal or otherwise***, to Annucci's simply and unilaterally releasing Vincent." *Id.* (emphasis added). The Court thus directed the district court on remand to "clarify that question, bearing in mind that ***the burden rests upon the plaintiff to establish the onset date*** for calculating any compensatory damages to which he may be entitled. If no such impediment existed, the plaintiff will have satisfied his burden upon the existing record. ***If an impediment is claimed, the district court must determine its validity and effect, if any, upon the length*** of Vincent's unlawful incarceration." *Id.* (emphasis added); *see also id.* n.58 ("Because there remains the possibility that Vincent would have been incarcerated for some period of time despite Annucci's best efforts to secure his release, there remains a question as to what harm Annucci's inaction caused Vincent. This question must be answered on remand.").

## C.    The Instant Motions

Recognizing that *Vincent* had implications for the instant case, the Court invited proposals from the parties as to how they wished to proceed. (Dkt. 372.) Plaintiffs requested that the Court adjourn trial, which was scheduled to start on May 9, 2023, to allow for limited discovery and expedited summary judgment briefing. (Dkt. 378.) Defendants endorsed that approach, as did the Court. Accordingly, on April 19, 2023, the Court ordered Plaintiffs to serve, and Defendants to answer, contention interrogatories directed to any impediments to release from PRS claimed by Defendants.

(Dkt. 382.)  The Court further directed that if Plaintiffs believed that the answer to the interrogatories warranted further factual discovery, they should notify the Court.  (*Id.*) Finally, the Court ordered the parties to file cross-motions for summary judgment to address three issues: (i) the impediment/causation issue identified by the majority in *Vincent*, (ii) this Court's previous ruling with respect to *Nunc Pro Tunc* class members, and (iii) implications for continuation as a class action for general loss-of-liberty damages. (*Id.*)

Following Defendants' answers to the contention interrogatories, Plaintiffs did not seek further discovery.  Instead, they relied on the discovery obtained earlier in the case. The cross-motions are now fully briefed.   In addition to their briefs, Defendants filed declarations from Annucci, Fischer, and Tracy.  (Dkts. 401-03.)  Plaintiffs correctly point out that, to some extent, Defendants' declarations either are inconsistent with their prior testimony or recycle previously rejected excuses for their failure to follow *Earley*.  (*See* Pl. Reply Mem. at 4-6.[13])  But to the extent Defendants' declarations are not inconsistent with prior testimony, the Court has considered them.  *See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (parties may not raise issues of fact on summary judgment by submitting affidavits that are inconsistent with their prior sworn deposition testimony); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (same).

The Court heard oral argument on November 21, 2023.

---

[13] "Pl. Rep. Mem." refers to Plaintiffs' Memorandum Of Law In Further Support Of Plaintiffs' Motion For Partial Summary Judgment And In Opposition To Defendants' Cross-Motion For Partial Summary Judgment filed Aug. 30, 2023 (Dkt. 411.)

## SUMMARY JUDGMENT STANDARDS

To obtain summary judgment under Rule 56, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a).  The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."  *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008).  Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted.  *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

In assessing the record to determine whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 ("[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). The Court must "eschew credibility assessments." *Smith v. Barnesandnoble.com*, *LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal citation marks omitted). However, conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248. Summary judgment thus may be granted "where the nonmovant's evidence is conclusory, speculative, or not significantly probative." *Zeno v. Pine Plains Central School District*, No. 07-CV-6508, 2009 WL 1403935, at *2 (S.D.N.Y. May 20, 2009) (citing *Anderson*, 477 U.S. at 249-50); see *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

## I.   IMPEDIMENTS

The question posed by *Vincent* is to what extent legal or practical impediments stood in the way of Defendants' immediately and unilaterally excising Plaintiffs' unlawful PRS and releasing them from their incarceration for violating the terms of that PRS; and, if so, to what extent those impediments affect determination of damages attributable to Defendants. *See* 63 F.4th at 154. To a large extent, although not entirely as will be explained, the record establishes indisputably that, upon learning of *Earley*, Defendants had the authority and ability to act unilaterally. Nonetheless, there were practical impediments that affected the immediacy with which Defendants could release individuals

from administratively imposed PRS, the facts of which remain to be established and necessarily vary from class member to class member.

## A.    No Need For Court Order

DOCS unlawfully added terms of PRS to class members' sentences without a court order.  No court order was required for DOCS to undo, or DOP to cease enforcing, the unlawful PRS terms DOCS unilaterally imposed.  After all, the administratively imposed PRS terms were "null and void."  *Vincent*, 63 F.4th at 148; *Betances III*, 837 F.3d at 166 (PRS imposed by DOCS was a "nullity").  No court action was required to undo what was never judicially ordered or legally effective.  Judge Scheindlin directly addressed the point in *Betances II*, explaining:

> Because *Earley* declared that any sentence beyond that imposed by the judge was a "nullity," it seems plausible that striking the term from offenders' records would not be correcting an illegal sentence (which DOCS does not have the authority to do), but rather ceasing to enforce a term that was never a part of the sentence at all.  In other words, because the PRS terms were void, no authority was necessary to eliminate these terms from offenders' records.

144 F. Supp.3d at 454 n. 93.

To be sure, court action was necessary to resentence individuals for whom their sentencing court did not pronounce PRS.  But as explained above, resentencing was an ***alternative*** to excision of PRS. *Vincent*, 63 F.4th 148 (explaining that following *Earley,* the state was required to either arrange for people to be "resentenced by the court for the imposition of PRS terms in a constitutional manner or … excise the PRS conditions from their records and relieve them of those conditions."  (emphasis omitted).  Defendants, however, pursued neither alternative, instead deliberately choosing not to act in any meaningful way.   Moreover, as also explained above, resentencing was ***not*** a

constitutionally valid option for individuals, like Incarcerated Plaintiffs, "who had served their judicially imposed determinate sentences and had been released from custody, only to be re-incarcerated for violating the terms of their administratively imposed PRS." *Id.* at 152. For those class members, excision was the only option. In any event, **no** class member needed to be resentenced in order for DOCS to remove, or DOP to cease enforcing, their administratively imposed, null-and-void PRS because it was never part of their lawful court-imposed sentence to begin with.

Despite taking a contrary position in their briefing, Fischer and Annucci admitted that they could have acted without a court order to remove the PRS they wrongfully imposed. Fischer's testimony is particularly apt:

> Q.    And I think we established earlier but I want to make sure, that DOCS had the sole responsibility for computing and maintaining sentence calculations, right?
>
> MR. KEANE [defense counsel]:  Objection.
>
> A.    That's correct.
>
> Q.    And so one action that you had within your authority to take would be to issue a directive saying we are going to recalculate the sentences of anyone who's been released but is in the group we've identified who is being subjected to post-release supervision because we added it even though it wasn't on the commitment order, right?
>
> MR. KEANE:  Objection.
>
> A.    Yes.
>
> Q.    So you had the authority and the power to accomplish that by ordering the recalculation of those sentences, right?
>
> MR. KEANE: Objection.
>
> A.    Correct.

Q.    And that's power and authority that you had from the minute you became commissioner in January 2007, right?

MR. KEANE:  Objection.

A.    Correct.

Q.    And your predecessors had that same power and authority, to order the recalculation of sentences to remove PRS that had only been imposed by DOCS because it wasn't on the commitment order, right?

MR. KEANE:  Objection.

A.    That's correct.

(Bourland Decl. Ex. B at 222:21-224:2.)  Annucci similarly conceded that, based on complete information, he could have "nullified any DOCS sentences to PRS that were inconsistent with the commitment orders," although he probably would have first consulted with the Commissioner of DOCS and possibly the Governor's office.  (Bourland Decl. Ex. C at 167:7-168:2.)

As for Tracy, Defendants argue that he could not act unilaterally because DOP was required to rely on the sentence calculations received from DOCS, and Tracy "would not have been authorized to reject DOCS calculations."  (Def. Mem. at 26-27.[14])  Defendants are correct that DOP followed DOCS' lead.  *See* Bourland Decl. Ex. B at 226:6-14 (Fischer testifying that DOCS is "the sole authority when it comes to sentences and calculations, and the basic rule is parole has to follow whatever the calculations are

---

[14] "Def. Mem." refers to Defendants' Memorandum Of Law In Opposition To Plaintiffs' Motion For Partial Summary Judgment And In Support Of Defendants' Cross Motion For Partial Summary Judgment And Motion To Modify Or Decertify The Class filed Aug. 14, 2023 (Dkt. 404.)

that are made by DOCS").  But that does not mean either that DOP needed a court order to release inmates subject to unlawful PRS or that DOP could invoke state procedures or laws as an excuse for not adhering to the federal constitutional dictates pronounced in *Earley*.  *See Yelich*, 718 F.3d at 169.  Moreover, had DOCS excised unlawfully imposed PRS as required by *Earley*, DOP would not then be in a position to continue enforcing it.  As Fischer testified, DOP "would have to release" from parole anyone whose sentence was recalculated to omit PRS.  (Bourland Decl. Ex. B at 225:13-226:5.)  Fischer qualified that BOP may have made the decision not to release individuals and instead challenge the recalculation in some way (*Id.* at 226:15-25); but he did not testify to any impediment preventing BOP from adhering to the newly calculated sentence.  Nor did Tracy.

Notwithstanding their admissions, Defendants argue that they were powerless to act in the absence of a formally blessed legal mechanism for pursuing resentencing for individuals subject to wrongful PRS.  (Def. Mem. at 21-24.)  In Defendants' view, they "had legal authority to refer individuals for resentencing only after June 30, 2008" with New York's enactment of Correction Law § 601-d, and therefore "did not cause damages earlier than that date."  (Def. Mem. at 22.)  Conversely, Defendants argue, once § 601-d was enacted, they had no choice but to follow its procedures for resentencing and could not unilaterally release individuals subject to wrongful PRS.  (*Id.* at 22-23.)  Not so.  As the Second Circuit has explained: "federal constitutional standards rather than state law define the requirements of procedural due process.  The fact that the State may have specified its own procedures that it may deem adequate for official action, does not settle

what protection the federal due process clause requires."[15]  *Yelich*, 718 F.3d at 169 (internal quotation marks and modifications omitted); *see also Garcia v. Elk*, No. 09-CV-2045, 2015 WL 1469294, at *7 (E.D.N.Y. Mar. 30, 2015) (recognizing that the Court in *Yelich* "rejected" the argument that "a parolee is not entitled to be released from PRS obligations (even if the parolee was reincarcerated) until the parolee was resentenced by a court pursuant to § 601-d").

Defendants also once again invoke the requirements of Jenna's Law and the "widespread understanding" of state courts and district attorneys that PRS was "an automatic component of a determinate sentence" as reasons they "reasonably understood that the sentencing courts generally intended to impose PRS terms."  (Def. Mem. at 18.)  What Defendants understood about state sentencing law or the reaction of other state actors is irrelevant to whether they were impeded from acting once *Earley* clearly established the illegality of administratively-imposed PRS.  The reluctance of some state courts and district attorneys to act in compliance with *Earley* may have been an impediment if their action was necessary to excision and release, as it was for resentencing.  But, for the reasons explained, it was not.

The Court finds that Plaintiffs have indisputably established that Defendants Fischer and Annucci did not need a court order to excise the unlawful PRS terms imposed by DOCS, and that Tracy did not need a court order to cease enforcing those terms.

---

[15] For the same reasons, Correction Law § 601-a was no more an impediment to action than § 601-d.  Moreover, § 601-a addresses resentencing for defendants whose original court-imposed sentence was unlawful, not resentencing for defendants subject to administratively imposed PRS.  N.Y. Corr. Law § 601-a.

**B.     Practical Impediments**

That Defendants could have acted unilaterally does not mean that class members would have been freed from unlawful PRS or reincarceration as soon as the Second Circuit issued its decision in *Earley*.  Defendants were found liable for failing to make reasonable efforts to comply within a reasonable time.  *See Betances III*, 837 F.3d at 172 (finding that Defendants eventually took "reasonable steps" to comply with *Earley* following the New York Court of Appeals' decisions in *Garner* and *Sparber* but "***unreasonably delayed***" in doing so) (emphasis added); *Yelich*, 718 F.3d at 172-73 (stating that DOCS "had an obligation to ***at least attempt*** to cease its administrative and custodial operations that had been held to violate federal law") (emphasis added).  Even if Defendants had acted the day that *Earley* issued, practical impediments would have delayed class members' release from unlawful PRS.  *See Earley v. Annucci*, No. 08-CV-669, 2018 WL 5993683, at *3 (N.D.N.Y. Nov. 15, 2018) ("*Earley II*") ("even if Defendant Annucci addressed the issue immediately upon the issuance of *Earley* … it would still take a period of time to take whatever corrective action was necessary"), *rev'd on other grounds*, 810 F. App'x 60 (2d Cir. 2020); *cf. Hassell v. Fischer*, 879 F.3d 41, 47 (2d Cir. 2018) (describing trial court's determination that damages period excluded initial 90-days because Defendants should have been able to file a resentencing motion within 45 days, and the state court should have acted within 45 days after that).

**1.     Time For Review Of Records**

In order to determine who should have been released from administratively imposed PRS, DOCS and DOP needed to first conduct a review of records to identify individuals whose commitment orders did not include PRS but nonetheless were subjected to PRS added by DOCS.  It is undisputed that such a review could have been

conducted and would have taken four to six weeks; the belated review DOCS conducted in 2007 and on which it sat confirms the point.  (*See* Def. 2023 56.1 Resp. ¶¶ 56-58.) Pursuant to *Vincent*, that review period would precede the "onset date" for calculating any compensatory damages to which class members may be entitled.  63 F.4th at 154.  That is not, however, the end of the inquiry.

### 2.       "Silent Ambiguity" And Incomplete Documentation

Defendants contend that their review of records required more than just compiling the information from commitment orders.  They argue that commitment orders that did not include any PRS term were ambiguous by their silence; that there were instances where courts had orally pronounced PRS terms at sentencing even though the commitment orders did not reflect it; and that "unilateral release risked violating a term of PRS expressly pronounced at sentencing."  (Def. Mem. at 15.)  Defendants further assert that they would have had to obtain and review additional documentation, such as sentencing minutes, that they did not have in their possession or could not track down. (*Id.* at 19.)  Plaintiffs do not agree.  They assert that the commitment order is the definitive source governing DOCS sentencing entries and that Defendants did not need to look beyond the commitment order to remedy unlawful PRS any more than they did when it was wrongfully imposed in the first place.  (Pl. Reply Mem. at 12-13.)  The law, however, is more nuanced than Plaintiffs would have it.

The Second Circuit in *Earley* grounded its holding on *Hill v. United States ex rel*. *Wampler*, 298 U.S. 460 (1936).  "In *Wampler*, a federal judge orally sentenced the petitioner to eighteen months in prison and imposed a $5,000 fine.  The clerk of the court, following a local practice known to the court, added the condition that the defendant remain in custody until his fine was paid.  The Supreme Court held that the clerk did not

have the power to alter the sentence imposed by the court, and therefore the added condition was void." *Earley*, 451 F.3d at 74.  In holding as it did, the Supreme Court expressly addressed the force of the sentence pronounced by the court compared to a commitment order that departs from that sentence:  a "warrant of commitment [prepared by the clerk] departing in matter of substance from the judgment back of it is void….  The prisoner is detained, not by virtue of the warrant of commitment, but on account of the judgment and sentence."  *Wampler*, 298 U.S. at 465 (internal quotation marks and citations omitted).  In short, "[o]nly the judgment of a court, as expressed through the sentence imposed by the judge, has the power to constrain a person's liberty."  *Earley*, 451 F.3d at 75 (citing *Wampler*, 298 U.S. at 464); *see also id.* at 74 ("the Supreme Court established that the sentence imposed by the sentencing judge is controlling; it is this sentence that constitutes the court's judgment and authorizes the custody of the defendant.").

Together, *Wampler* and *Earley* establish the supremacy of the judgment pronounced by the sentencing court over an incorrect commitment order or a term added administratively.  Defendants thus are correct in recognizing that they could not lawfully release inmates from PRS, or reincarceration for violation of PRS, that had been pronounced by the sentencing court but mistakenly omitted from the corresponding commitment order.

Still, Plaintiffs contend that Defendants need not have concerned themselves with what actually happened at sentencing and instead only needed to review and be guided by the presence or absence of PRS terms in the commitment order.  (Pl. Reply Mem. at 15-16.)  In support, Plaintiffs rely on a statement from the New York Court of Appeals that

"'prison officials are **conclusively bound** by the contents of commitment papers accompanying a prisoner.'"  (Pl. Mem at 12.[16]) (quoting *Matter of Murray v. Goord*, 1 N.Y.3d 29 (2003) (quoting *Middleton v. State of New York*, 54 A.D.2d 450, 452, 389 N.Y.S.2d 159 (3rd Dep't 1976), *aff'd*, 43 N.Y.2d 678 (1977)) (emphasis added by Court of Appeals).  That statement, however, must be considered in the context in which it was made.

The question addressed in *Murray* was the priority to be given between one court's order that terms of imprisonment be served consecutively and a later court's order, after appeal and a guilty plea to shorter periods of confinement, that they be served concurrently.  *See* 1 N.Y.3d at 32.  More specifically, the issue "boil[ed] down to the question of whether, when there is a vacated judgment of conviction and subsequent resentencing of someone subject to an undischarged term of imprisonment, the prerogative to decide whether sentences should run consecutively or concurrently always remains with the second judge who acts in the sentencing sequence."  *Id*.  The Court of Appeals noted that DOCS claimed to have been forced to choose between inconsistent directives.  *Id*.  While appreciating that "dilemma," the Court countered with the statement that prison officials are conclusively bound by the commitment papers accompanying a prisoner as a segue into its ultimate holding that "DOCS' only valid option in circumstances such as these is to comply with the plain terms of the **last** commitment order received."  *Id*. (emphasis added).  The Court of Appeals thus was addressing the

---

[16] "Pl. Mem." refers to Memorandum Of Law In Support Of Plaintiff's Motion For Partial Summary Judgment filed June 23, 2023 (Dkt. 393).

priority of sequential commitment orders.  It did ***not*** address the obligation of whether a commitment order took precedence over the court's sentence pronounced at sentencing.

In addition to taking the statement in *Murray* out of context, Plaintiffs also rely on statements and admissions by Defendants taken out of context.  For instance, Plaintiffs point to Tracy's agreement that "ultimately the sentence and commitment order is the controlling document," that BOP "act[s] on that order," and "there is no need to go to look to sentencing minutes or plea minutes to double check and make sure the [commitment order] is correct.  (Pl. Mem. at 13; Bourland Decl. Ex. D at 106:1-19.)  Tracy's testimony, however, was given in the context of his being asked about a commitment order that ***includes*** a term of PRS.  (Bourland Decl. Ex. D at 105:13-16, 106:8-13.)  Tracy was not asked whether he would need to look at the sentencing or plea minutes in instances where the commitment order was ***silent*** as to PRS.

Similarly, Plaintiffs cite to testimony in which Annucci agreed that in 2006 DOCS "had the capability to manually look at every [commitment order] for determinate sentence and figure out which ones there was no indication of PRS."  (Pl. Mem. at 13 (quoting Bourland Decl. Ex. C at 168:12-20).)  That admission, however, says nothing about whether DOCS would need to look to sentencing minutes or other information to determine if commitment orders that had "no indication of PRS" did not reflect PRS orally pronounced at sentencing.  Plaintiffs also cite other Annucci admissions as if they were absolutes, when in fact they were qualified.  The following exchange is illustrative:

> Q.    When DOCS has jurisdiction over an inmate, as
> I understand it, that jurisdiction flows solely and exclusively
> from the sentence and commitment order of the court, right?
>
> MR. KEANE:  Objection.

A.      *In general*, yes.

Q.      Is there anything else, any other court document that gives DOCS the power to incarcerate a human being aside from the sentence and commitment order?

MR. KEANE:  Objection.

A.      *I believe* it's only the sentence and commitment order that gives DOCS the authority to confine an individual.

Q.      Right, it's – that's *basically* the judgment of the court, right?

MR. KEANE:  Objection.

A.      Yes.

Q.      And is that judgment that to be effectuated by, in this case, DOCS taking custody of an individual and complying with that judgment, right?

MR. KEANE:  Objection.

A.      Yes.

(Bourland Decl. Ex. C at 62:12-63:9 (emphasis added).)

There is no dispute that Defendants considered and acted on commitment orders to calculate sentences or that they considered commitment orders to embody the sentence and judgment of the Court.  Indeed, except for instances of commitment orders silent on PRS, DOCS' practice was to implement the terms of the commitment orders as written even if they were plainly inconsistent with what the law required unless and until corrected by a court.  (Bourland Decl. Ex. E (deposition testimony of Richard de Simone, Associate General Counsel in charge of the Office of Sentencing Review) at 111:18-25.) And there is no dispute Defendants added or enforced PRS terms that did not appear in the commitment order.  But that does not then mean that Defendants did not need to look

beyond the commitment order for purposes of **releasing** persons from administratively imposed PRS and making sure the commitment order did not mistakenly omit PRS.  Both *Wampler* and *Earley* dictate that the sentence pronounced, not the commitment order, is the judgment pursuant to which DOCS and DOP may exercise custody over inmates.  Defendants are thus correct that simply releasing any inmate whose commitment order was silent as to PRS risked releasing persons who had PRS imposed at sentencing.

Concern for that risk was not without reason.  As Defendants have emphasized over and over, the Penal Law required that PRS be imposed on individuals convicted of crimes the same as those for which the class members were convicted and, as a result, Defendants believed courts had intended to impose PRS even if not reflected in the commitment order.  While that does not excuse Defendants from having immediately taken steps to adhere to *Earley*, it explains why Defendants could have expected there may have been inmates whose commitment orders did not reflect PRS actually pronounced at sentencing.  And, in fact, the concern was not hypothetical as Plaintiffs would have it.[17]  (*See* Pl. Reply Mem. at 11.)  Plaintiffs concede that DOCS did not always

---

[17] In attempting to minimize the import of commitment orders that errantly omitted PRS pronounced at sentencing, Plaintiffs undercut the notion that Defendants could, or should, have immediately excised terms of unlawful PRS and released persons reincarcerated for violating those terms.  Specifically, Plaintiffs argue that the fact of there being some quantity of commitment orders that incorrectly omitted PRS "does not excuse Defendants' wholesale, undisputed failure to" immediately identify criminal defendants whose commitment orders were silent as to PRS but were subject to administratively imposed PRS and then "use that information to alert the impacted criminal defendants and their sentencing courts about these potentially infirm sentences."  (Pl. Reply Mem. at 12.)  Agreed.  But the argument that Defendants should have first used the information they had to "**alert**" criminal defendants and their sentencing courts about "**potentially** infirm sentences" undercuts Plaintiffs' argument that Defendants could, or should, have immediately and unilaterally released individuals from administratively-imposed PRS.  The argument also suggests the individualized nature of the impediment inquiry.

receive sentencing minutes even though the Penal Law required sentencing minutes to be sent to DOCS. (Pl. 2023 56.1 Resp. ¶ 7.)  Indeed, that was so for a majority of cases. (2015 Annucci Decl. ¶ 6.)  Plaintiffs further concede that DOCS did not always have sufficient records to determine whether the sentencing judge orally pronounced PRS.  (Pl. 2023 56.1 Resp. ¶ 13.)  And they concede that in some cases in which DOCS did have sentencing minutes, PRS had in fact been pronounced by the sentencing court even though the commitment order was silent on the subject.  (*Id.* ¶ 14.)  In its review of records in May 2008, DOCS identified 45 such cases.  (Annucci Decl. ¶ 44.)

Plaintiffs brush the silent ambiguity problem aside by arguing that the Court previously rejected Defendants' need to review sentencing minutes in holding that "the lack of these minutes does not relieve defendants of liability."  (Pl. Reply Mem. at 14 (quoting *Betances II*, 114 F. Supp3d at 454 n.95).)  Defendants are correct, however, that Plaintiffs unduly conflate liability with the question of damages causation posed in *Vincent*.  Defendants have been held liable for not taking affirmative steps to seek a remedy within a reasonable time following *Earley*.  That is a different matter than how long it would have taken Defendants to achieve a remedy had they acted reasonably and timely.

### 3.   An Individualized Inquiry

To sum up, Defendants had the authority to unilaterally excise unlawful PRS and to release persons reincarcerated for violating unlawful PRS.  Before doing so, Defendants needed to review records to determine who had been subject to unlawful PRS.  In some instances, Defendants had in hand all the information they needed.  In other instances, they needed more information and, eventually, were able to obtain it.  In

still other instances, it may be that they were not able to obtain all necessary information to make the determination.[18]

That does not mean, however, that it would be reasonable for Defendants to wait to excise wrongful PRS and release persons wrongfully reincarcerated until Defendants had the necessary information for all 8,100 individuals whose commitment orders were silent.  Nor was it reasonable as between "continuing to supervise or detain somebody without authority or suspending supervision only to find out later that Parole had authority," to, as Tracy did, "err on the side of continuing supervision and continuing incarceration until [the agency] could get those people back before court …."  (Def. 56.1 Resp. ¶ 34.)  Rather, as excision was the only option for class members, it was incumbent on Defendants to start taking affirmative steps immediately after *Earley* to review files, obtain records, and act to excise and release.

As noted, the record indisputably establishes that a review of all relevant commitment orders would have taken no more than four to six weeks.  There is insufficient record information, however, to assess what length of time was needed to confirm that

---

[18] Defendants assert in their 56.1 statement that as of June 4, 2008, DOCS had 546 individuals in custody for PRS violations whose commitment orders were silent as to PRS and for whom DOCS did not have all of the necessary documentation to determine whether a term of PRS had been pronounced.  (Pl. 2023 56.1 Response ¶16.)  As support, the statement cites to Annucci Decl. ¶¶ 47, 52, neither of which address the fact asserted.  Many of Defendants' other 56.1 statements similarly cite to declarations or other record material that do not address the matter asserted.  In some instances, the Court has located the supporting information in other portions of the record (such as declarations submitted in connection with earlier summary judgment motions).  In other instances, the Court has not located supporting information, in which instances the Court has not credited the assertion.

PRS had not been orally pronounced at sentencing.[19]  Again, Defendants already had

that information in hand for some and not others.  The additional time needed to review

those materials would be minimal.  For other individuals, the information may have been

sought and received quickly.  For others, information may have been obtained only after

some difficulty.  To the extent insufficient information was available, Defendants could

have then promptly sought relief in the Court.  Consequently, there is no uniform length

of time that would apply to all class members.  The inquiry necessarily is individualized

and cannot be resolved as a matter of summary judgment on the record before the Court.

And, that has implications for class decertification addressed in Part III below.

## C.    Other Alleged Impediments

Defendants contend that three other impediments apply to some but not all class

members:  (1) detainers, (2) court orders upholding a term of PRS as lawful, and (3)

administrative decisions within DOP imposing a time assessment for PRS violations.

(Def. Mem. at 24-26.)  The Court addresses each in turn.

First, Defendants assert that they could not unilaterally release individuals who

were subject to other lawful detention orders or laws, including orders to produce

individuals for resentencing in accordance with Correction Law § 601-d (which did not

even come into effect until 2008); detainers from other state, local and federal law

enforcement agencies; and statutory holds for sex offenders, mental health patients, or

medical patients.  (Def. Mem. at 24.)  As Plaintiffs correctly note, however, none of those

---

[19] At oral argument, Plaintiffs asserted that all investigation necessary to determine what
had happened at sentencing would have been completed in all or most all cases between
the Second Circuit's initial decision in *Earley* on June 9, 2006, and denial of
reconsideration on August 31, 2006.  (Oral Arg. Tr. at 24:25-25:1.)  Plaintiffs did not cite
any evidence in the record for that assertion.  While the proposition may prove to be true,
the Court has no basis to make that factual finding at this time.

reasons for detaining an individual prevented Defendants from releasing the individual from wrongful PRS and then either turning over the individual to the relevant detaining authority or holding the individual pursuant to other lawful requirements.  (Pl. Mem. at 16-17.)  That is not to say that the various detention orders and requirements are irrelevant.  To the contrary, as Plaintiffs acknowledge, such detainers are a factor in determining the period of damages for which Defendants may be held responsible for individuals subject to those detainers.  (*Id*. at 17.)

Defendants also assert that they were impeded from releasing individuals in instances where a court had upheld a term of PRS as lawful.  (Def. Mem. at 25.)  They provide an example of a plaintiff from another action who challenged his PRS in an Article 70 habeas corpus proceeding in 2007, only to have his challenge rejected, and the PRS validated by a Supreme Court judge.  (*Id*.)  As with detainers, the fact that a state court had validated PRS previously imposed would be a factor in determining the time period for which Defendants could be held responsible for damages.  *See Aponte*, 75 F.4th at 60-61 (holding that "in the circumstances of this case," Defendants were shielded by qualified immunity both before and after New York Court of Appeals decision in *Williams* for adhering to court order resentencing plaintiff to include PRS terms).  Indeed, "Plaintiffs have never claimed that they are entitled to damages related to PRS or its consequences that occurred after and resulted from their resentencing to a term of PRS by a state court."  (Pl. Reply Mem. at 21.)

Third, Defendants assert that they were impeded from acting immediately and unilaterally in cases where administrative law judges, or hearing officers, had revoked release and imposed additional time in custody for violating the terms of administratively

imposed PRS.  (Def. Mem. at 25-26.)  Defendants describe the procedures provided by
state law for appealing a time assessment to the Parole Board within DOP and then
seeking judicial review in a state court proceeding.  (*Id.*; *see also* Tracy Decl. ¶¶ 19-20.)
Based on those prescribed administrative and available judicial procedures, Defendants
state they could not unilaterally expunge a determination of the Parole Board.  Fischer
and Annucci purportedly could not do so because they were DOCS officials, which
operated separately from DOP before 2011.  (*Id.* at 26; *see also* Tracy Decl. ¶ 2.)  And
Tracy avers that he lacked legal authority to unilaterally vacate a final time assessment
imposed by the Parole Board.  (Tracy Decl. ¶ 21.)

Defendants, however, cite no legal authority that would have barred Tracy from
directing BOP officials from expunging a time assessment with respect to individuals who
were reincarcerated pursuant to unlawful PRS.  As explained above, the PRS imposed
by DOCS was null and void.  Reincarceration for violating a legal nullity was no less a
nullity.  *See Vincent*, 63 F.4th at 153 ("the consequences that flowed from the
administratively-imposed PRS – including [plaintiff's] PRS-based incarceration – were
likewise unauthorized and without legal effect").  And notwithstanding the quasi-judicial
nature of hearings presided over by administrative law judges, the revocation and
reincarceration process was still wholly within DOP's administrative domain.  The fact that
inmates could have challenged their reincarceration through administrative and judicial
procedures does not mean that they were required to do so to obtain release from the
consequences of unlawful PRS.  *See Vincent*, 718 F.3d at 169 ("The fact that the State
may have specified its own procedures that it may deem adequate for official action does

not settle what protection the federal due process clause requires") (internal quotation marks and modifications omitted).

### D.    Conclusion On Impediments

Both parties have moved for summary judgment on the issue of whether or not impediments existed that would have prevented or delayed Defendants' ability to unilaterally and immediately excise unlawful PRS and release individuals who were reincarcerated pursuant to unlawful PRS.  The Court grants in part and denies in part the cross-motions concerning impediments.   Defendants had the authority to unilaterally excise unlawful PRS and to release persons reincarcerated for violating unlawful PRS. They could not, however, do so immediately.  Four to six weeks was required for DOCS to review all commitment orders, and additional time was required to confirm whether or not PRS had been pronounced at sentencing.   The length of time that additional step would have taken is a factual matter that cannot be determined on the present record and that will vary among individual cases.   Further, Defendants could not release inmates subject to detainers or other legal detention requirements, a fact that may cabin the length of time for which class members are entitled to recover damages against Defendants. Whether that is so will also vary from case to case.

## II.  NUNC PRO TUNC PLAINTIFFS

In *Betances IV*, this Court held that the *Nunc Pro Tunc* Plaintiffs – who were referred for resentencing and received the same terms of PRS *nunc pro tunc* as they had received when administratively imposed by DOCS – were limited to nominal damages. 403 F. Supp.3d at 230-34.  Plaintiffs contend that *Vincent* requires the Court to revisit that determination and hold instead that *Nunc Pro Tunc* Plaintiffs are entitled to more than nominal damages.  (Pl. Mem. at 18-20.)  Defendants argue that the Court's earlier holding

is consistent with *Vincent* and need not be undone.  (Def. Mem. at 27-28.)  The Court agrees with Plaintiffs, at least insofar as *Nunc Pro Tunc* Plaintiffs are not categorically limited to nominal damages.

The Court based its decision in *Betances IV* on *Hassell v. Fischer*, 879 F.3d 41 (2d Cir. 2018).  There, Hassell was subject to administratively imposed PRS but was not reincarcerated for violating its terms.  He sought damages for a period of delay following his release from prison but prior to his resentencing when the trial court resentenced Hassell to his original sentence as well as five years of PRS *nunc pro tunc.  Id*. at 45.  The district court found that despite the delay, Hassell was entitled to only nominal damages because the result would have been the same even without the delay; that is, Hassell would have been resentenced with PRS *nunc pro tunc*.  *Id*. at 47 (restating the district court's observation that "no matter when [the state judge] resentenced Hassell, she would have imposed the same five-year term of PRS that she imposed [after the delay period], and done so *nunc pro tunc*," and thus the delay "'would not have changed Hassell's life in the slightest'").  This Court applied similar reasoning to the *Nunc Pro Tunc* Plaintiffs. 403 F. Supp.3d at 232.

In *Vincent*, Annucci made a similar argument as made in *Hassell* – "had he promptly referred Vincent for judicial resentencing after *Earley*, the state court would have likely imposed PRS *nunc pro tunc*."  63 F.4th at 153.  The Second Circuit rejected that argument, however, because resentencing was not a constitutionally viable option for persons like Vincent who had served their judicially imposed determinate sentence but were subsequently reincarcerated for violating unlawful PRS.  *Id*.  "Put differently, a defendant, like Vincent, who was incarcerated for violating the terms of an

administratively imposed PRS could not have been resentenced *nunc pro tunc* for the simple reason that courts do not have the power to substantively rewrite history or backdate events."[20] *Id.*

For Vincent, resentencing was a hypothetical alternative that never happened and would not have been valid even if it had.  In contrast, the *Nunc Pro Tunc* Plaintiffs were actually resentenced but after their determinate sentence had ended.  Hypothetical or not, the result is the same under *Vincent*: resentencing of an individual following completion of their determinate sentence cannot remedy *nunc pro tunc* their reincarceration for violating PRS imposed by DOCS.  Accordingly, even *Nunc Pro Tunc* Plaintiffs, at least those who were reincarcerated, potentially can recover more than nominal damages.[21]

Defendants do not engage with the implications of *Vincent*'s holding about the unavailability of *nunc pro tunc* resentencing.  Instead, they merely reiterate their argument

---

[20] The Court distinguished its holding in *Vincent* from its decision in *Hassell* on the basis that Vincent was subject to reincarceration for violating the terms of his administratively imposed PRS, whereas Hassell "was resentenced by the court and was not incarcerated for violating his administratively imposed PRS."  63 F.4th at 153 n.48.

[21] The Second Circuit in *Vincent* did not express an opinion as to whether resentencing would have been possible for individuals whose determinate sentences had concluded and were serving administratively imposed PRS but were not reincarcerated for violating PRS (i.e., PRS Only Plaintiffs).  63 F.4th at 154 n.53.  The Court does not see why the relevant concerns such as the bar against double-jeopardy would not apply just as well to resentencing of PRS Only Plaintiffs.  But even if resentencing were an option for such individuals, so was excision and release from wrongful PRS, at least until such time as the individuals were resentenced.  Accordingly, such individuals would not necessarily be precluded from seeking more than nominal damages.  At oral argument, however, Plaintiffs conceded that there may be, or at least there is an open question as to whether there are, some individuals who ultimately would be entitled only to nominal damages in instances where the individual was resentenced while on PRS and before the maximum expiration date of their determinate sentence.  (Oral Arg. Tr. at 4:9-7:9.)

that Plaintiffs faced impediments to their release (Def. Reply at 10[22]), and otherwise raise a straw man, arguing that *Vincent*, along with the Second Circuit's decision in *Aponte*, establish that Defendants are entitled to qualified immunity for the time period ***after*** any Plaintiff was resentenced by a court because "a reasonable prison official might very well have properly followed the court order."  (Def. Mem. at 28 (citing *Aponte*, 75 F.4th at 61).) As Plaintiffs correctly observe, "Defendants miss the point."  (Pl. Reply at 21.)  The *Nunc Pro Tunc* Plaintiffs do ***not*** seek damages for any post-resentencing period.  Rather, they seek damages incurred ***before*** resentencing – the period of time during which the history of administratively-imposed PRS cannot be "rewrite[ten]."  *Vincent*, 63 F.4th at 153.

In view of *Vincent*, the Court vacates its previous holding that all *Nunc Pro Tunc Plaintiffs* are limited to only nominal damages.

### III. DECERTIFICATION

Defendants contend that in the wake of *Vincent*, the time has come to decertify the class to allow for individualized trials on damages.  (Def. Mem. at 29.)  The Court has denied Defendants' three previous motions to decertify.  *See Betances IV*, 403 F. Supp.3d at 237-38 (denying decertification in conjunction with resolving availability of compensatory and nominal damages); *Betances V*, 2022 WL 765963, at *12-13 (denying decertification in the context of pre-trial motions); *Betances VI*, 2023 WL 2609133, at *1 (finding mitigation defense did not warrant decertification).  Plaintiffs argue that the class should proceed to a trial on loss-of-liberty damages and that nothing has changed to

---

[22] "Def. Reply" refers to Defendants' Reply Memorandum Of Law In Further Support Of Defendants' Cross Motion For Partial Summary Judgment And To Modify Or Decertify The Class filed Sept. 15, 2023 (Dkt. 415).

warrant decertification before then.   (Pl. Reply Mem. at 22.)   The Court agrees with Defendants.

## A.      Relevant Procedural History Of Class Certification

Judge Scheindlin granted class certification in 2014.   She found satisfied the prerequisites of Fed. R. Civ. P. 23(a), namely numerosity, commonality, typicality, and adequacy of representation, as well as the implied requirement of ascertainability. *Betances Class Opinion*, 304 F.R.D. 416, 427-29.   She then found that proceeding as a class action was appropriate under Fed. R. Civ. P. 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3); 304 F.R.D. at 426, 429-32.   In granting class certification, Judge Scheindlin expressly contemplated that the class would be maintained for purposes of determining not only Defendants' individual liability but also general damages for loss of liberty.   *Id.* at 430-32. Following those class-wide determinations, the court could then turn to other case management tools, such as decertification, to address individualized damages issues. *Id.* at 432; *see also Betances IV*, 403 F. Supp.3d at 237 ("It is not uncommon for a class action to be bifurcated into a certified class for liability followed by decertification for purposes of determining damages") (citing cases).

In February 2019, this Court followed suit, maintaining the class, and agreeing with Plaintiffs that "[a]ny individualized damages can be dealt with after class-wide damages [for loss of liberty] are determined."   *Betances IV*, 403 F. Supp.3d at 236.   At that time, Defendants failed to point the Court to newly discovered evidence or new authority that would merit decertification.   *Id.* at 238.   In March 2022, when they next moved to decertify,

Defendants similarly did not bring to the Court's attention any change of law or fact meriting a different outcome.  *Betances V*, 2022 WL 765963, at *9.  And, a year later in March 2023, the Court held that the defense of failure to mitigate damages was relevant to individualized damages trials, but not to general loss-of-liberty damages.  *Betances VI*, 2023 WL 2609133, at *4.

## B.    Legal Standard Relevant To Decertification

Class certification orders under Rule 23 are not immutable.  An "order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  Indeed, "courts are required to reassess their ruling as the case develops."  *Boucher v. Syracuse University*, 164 F.3d 113, 118 (2d Cir.1999) (internal quotation marks omitted); *see also Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) ("the district court has the affirmative duty of monitoring its class decisions in light of the evidentiary development of the case." (internal quotation marks omitted)).

Courts may decertify classes "if it appears that the requirements of Rule 23 are not in fact met."  *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982) *cert. denied,* 459 U.S. 838 (1982).  Reconsideration of class certification is appropriate where there is a "significant intervening event" or "compelling reasons" that the Rule 23 requirements are no longer satisfied.  *Doe v. Karadzic*, 192 F.R.D. 133, 136-37 (S.D.N.Y. 2000) (internal citations omitted).  Thus, not only is this Court able to reevaluate its earlier determinations regarding class certification, it has an obligation to do so.  *Boucher*, 164 F.3d at 118; *Betances IV*, 403 F. Supp.3d at 236.  In opposing decertification, the plaintiff retains "the burden to demonstrate that [the Rule 23] requirements [a]re satisfied."  *Mazzei*, 829 F.3d at 270 (citing *Rossini v. Ogilvy and Mather, Inc.*, 798 F.2d 590, 596-600 (2d Cir. 1986)).

**C.     Decertification Is Warranted**

This action can no longer sustain its class status.   That is because the requirements of Fed. R. Civ. 23(b)(3) are no longer satisfied.[23]   *Vincent*, and the individualized impediment-related issues identified above, tip the scales of predominance and superiority.   The case can no longer bear the weight of individualized issues necessary to a damages determination.

Rule 23(b)(3) has two requirements:  (1) predominance, meaning that questions of law or fact common to the class members predominate over questions affecting only individual members, and (2) superiority, meaning class litigation is superior to other available methods for the fair and efficient adjudication of the dispute.  Fed. R. Civ. P. 23(b)(3).

**1.     Predominance**

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W.

---

[23] The Court finds that the requirements under Fed. R. Civ. P. 23(a) for numerosity, commonality, adequacy of representation, and ascertainability remain satisfied. Defendants have not suggested otherwise.  Defendants do suggest, however, that the named Plaintiffs are not sufficiently typical of the class based on impediment and causation issues.  (*See* Def. Mem. at 30-32 (citing typicality requirement; stating that Plaintiff Belize is not typical of the class; and characterizing Plaintiff Barnes as atypical of the class).)  Because the Court bases its decision to decertify on the requirements of Fed. R. Civ. P. 23(b)(3), the Court does not address typicality.

Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012) (internal quotation marks omitted)) (modification in original).

"The predominance inquiry is a core feature of the Rule 23(b)(3) class mechanism, and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Petrobas Securities*, 862 F.3d 250, 270 (2d Cir. 2017). The requirement thus is "'far more demanding'" than the "'commonality'" requirement under Rule 23(a)." *Id.* (quoting *Amchem Products*, 521 U.S. at 623–24). As the Second Circuit has explained, class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to only individualized proof." *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 118 (2d Cir. 2013) (internal quotation marks omitted). While "Rule 23(b)(3) requires that common questions predominate," however, it does not require "that the action include only common questions." *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010).

At this juncture, common issues no longer predominate over individual issues. The sole common issue is the inherent value of a day of lost liberty due either to reincarceration or the limitations on freedom posed by PRS. While that is an important and substantial issue, significant individual damages issues predominate, and it is no longer feasible to proceed further without addressing individual fact issues. *See*, *e.g.*, *Johnson v. GEICO Casualty Co.*, 310 F.R.D. 246, 254-55 (D. Del. 2015), *aff'd*, 627 F. App'x 150 (3d Cir. 2016) (decertifying class for purposes of damages due to individualized issues); *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-1831, 2014 WL 5794873, at *14

(N.D. Cal. Nov. 6, 2014) (decertifying class with respect to damages due to failure of model to show means of determining classwide damages with common proof); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 595 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x. 3 (2d Cir. 2015) (denying decertification for purposes of liability but granting decertification with respect to damages because individualized nature of damages would defeat predominance).

For reasons explained above, there is no uniformity of the facts relevant to the causation determination required by *Vincent*.[24]  In particular, there is no uniform "onset date" of the damages that can be attributed to Defendants due to the partial impediments with which they needed to contend.  The only remaining issue for which the class has been retained to date is to determine the value of damages for liberty lost due to common restrictions of PRS and due to reincarceration for violating unlawful PRS.  In theory, a trial could be had to determine a daily value of those general damages for lost liberty, although doing so, as has become clearer and clearer as this case has evolved, would be largely in a vacuum and untethered from any testimony beyond the most generalized.  In contrast, the PRS cases that have been tried to a damages verdict have been non-class cases addressing loss of liberty, physical harm, and emotional harm together in an individualized context.  *See*, *e.g.*, *Santiago*, 2023 WL 2974201, at *18 (upholding single $150,000 compensatory damages jury award in individual unlawful-PRS case without breaking out damages for loss of liberty, physical harm, and emotional harm); *Vincent v.*

---

[24] As noted earlier, this Court previously has ruled that Defendants may not relitigate the issue of causation in regard to liability.  *Vincent*, however, requires Plaintiffs to further prove "damages causation," which encompasses potential impediments as discussed above.  *Vincent*, 63 F.4th at 152, 154.

*Yelich*, No. 08-CV-6570L, 2020 WL 7090768, at *3 (W.D.N.Y. Dec. 4, 2020) (on damages inquest after granting summary judgment against Annucci for unlawful-PRS liability, awarding single figure of $175,000 to compensate collectively for loss of liberty and for pain and suffering and mental anguish associated with that detention), *aff'd in part, vacated in part*; *remanded*, 63 F.4th 145 (2d Cir. 2023); *Earley*, 2018 WL 5993683, at *6 (in evaluating damages for unlawful PRS, noting that Plaintiff identified personalized "aggravating factors" that made his life while incarcerated more difficult, and observing that "awards for a plaintiff who has a history of incarceration are generally lower than for a plaintiff who has never previously been incarcerated"), *rev'd and remanded on other grounds*, 810 F. App'x 60 (2d Cir. 2020).

But no such damages can be awarded until individual trials are held to determine for each class member the fact issues specific to their circumstances, such as, for example, whether DOCS and DOP had sentencing minutes in their possession; if not, what was needed to obtain those sentencing minutes, and how long would it have taken; if no sentencing minutes could be located, were there other relevant sources for that individual that DOCS and DOP could have obtained and reviewed, and, if so, how long would that have taken; what do the sentencing minutes or other materials indicate as to whether the sentencing court orally pronounced a term of PRS; and was the individual subject to a detainer or statutory hold requirement that would have shortened the time period for which he could recover damages, and, if so, what consequence did it have for that individual?[25]

---

[25] In *Fant v. City of Ferguson, Missouri*, the court was confronted with assessing the propriety of class action status for, among other things, claims for loss-of-liberty damages due to unlawful detention arising out of City officials' purposeful delay in processing newly

Plaintiffs assert that detainers present no basis for decertification because relevant records can be reviewed and considered when calculating the number of days of loss-of-liberty damages.   (Pl. Mem. at 17.)   That assumes, however, that the facts of any individual's detainer and its effect on damages will be beyond dispute.  Plaintiffs, however, have not presented any basis to make that assumption.[26]   Instead, they allude to this Court's statement in *Betances IV* that "[c]omplexity and the need to review documentation is not a basis to decertify the class."  403 F. Supp.3d at 238-39.  But that statement is taken out of context.  The Court's observation that complexity and the need for review of documentation was not an impediment to proceeding as a class action came in the context of discussing ascertainability of the class and whether objective criteria existed

---

arrested defendants.   No. 15-CV-0253, 2022 WL 2072647 (E.D.Mo. June 9, 2022). Similar to the "onset" inquiry here, the parties and court recognized that some period of administrative processing incident to arrest was necessary and therefore should be excluded from damages.  *Id.* at *12.  Unlike here, however, the plaintiffs in *Fant* offered expert analysis of the median number of hours it took for the necessary administrative steps thereby providing common proof for the class to establish the onset of compensable harm.  *Id.*

[26] *Fant v. City of Ferguson* again serves as a point of comparison.  There, the defendant City argued that portions of some class members' detention were due to reasons unrelated to plaintiffs' theory of liability, such as warrants from other jurisdictions.  2022 WL 2072647, at *12.  The court did not find that issue to be an impediment to class status because, as with the onset issue, plaintiffs provided expert analysis identifying those cases involving warrants from another jurisdiction and, additionally because the City would "be asking the Court to make assumptions regarding … delineation" between the time an arrestee was held on an outside warrant versus a City warrant or charge, "regardless of whether these claims were pursued on an individual or classwide basis." *Id.*  Again based on expert analysis offered by the plaintiffs – of the median time inmates were held in the City jail solely on warrants from other jurisdictions – the court noted that the detainer issue could be litigated with representative evidence.  *Id.* n.12.  No such evidence has been offered here, and Plaintiffs have not offered any expert to perform such an analysis.

by which to define the class.  *Id*. at 238-39.  That is a materially different issue than the prevalence of individualized fact issues that make continuing as a class unmanageable.

### 2. Superiority

Rule 23(b)(3) offers guidance in considering superiority, providing that "the matters pertinent to these findings include (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 24(b)(3); *Betances V*, 2022 WL 765963, at *13.

Several relevant factors that made initially proceeding with the instant case as a class action a superior vehicle remain unchanged.  While there are a number of individuals who would fall within the class that have prosecuted their own cases individually, thousands remain in the class and have not indicated interest in individually controlling their actions; the action has proceeded as a class for many years in this forum, resulting in substantial efficiencies; and the class is composed of individuals – former, and perhaps current, inmates – who may lack the resources or know-how to proceed individually.  *See id*. a *14.  And there is no doubt that the common policy and failures to act that lie at the heart of Defendants' liability were best addressed by proceeding as a class.  *See In re Nassau Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) ("when plaintiffs are allegedly aggrieved by a single policy of defendants, … the case presents precisely the type of situation for which the class action is suited") (internal quotation marks omitted).

But, for the same reasons that common issues no longer predominate, it is no longer sensible to manage the case as a class action. As individual trials are needed to award even loss-of-liberty damages, it will be fairer and more efficient to include all issues of individual damages in the same proceeding. *See In re Petrobas*, 862 F.3d at 270 ("Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" (quoting *Amgen Inc. v. Connecticut Retired Plans & Trust Funds*, 568 U.S. 455, 470 (2013), and citing 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778, at 141 (3d ed. 2005) ("[W]hen individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and... the risk of confusion is magnified" (footnote omitted)) (modification in original)).

In short, proceeding as a class action is no longer a superior vehicle to other mechanisms for resolving damages. The class will be decertified.

## CONCLUSION

For the foregoing reasons: (1) the parties' motions for partial summary judgment are granted in part and denied in part as set forth above; (2) the Court vacates its prior holding with respect to *Nunc Pro Tunc* Plaintiffs; and (3) the class is decertified. Determination of damages shall be resolved on an individual basis. To the extent not discussed above, the Court has considered the parties' arguments and determined them to be without merit. The parties shall meet and confer and by 30 days following entry of this decision and order shall file a joint letter proposing next steps, including prospects for conducting a bellwether trial of named or other plaintiffs.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: January 17, 2024
        New York, New York

Copies transmitted this date to all counsel of record.